S10A1601. BISHOP et al. v. PATTON et al.
(706 SE2d 634)

NAHMIAS, Justice.

This case involves two components of an interlocutory injunction. The trial court entered the injunction to preserve the status quo pending adjudication of the merits of plaintiffs' wrongful death and fraudulent transfer claims. The injunction barred the defendants and anyone acting in concert with them from transferring a house that one of the defendants gave to his three minor grandchildren in Florida three months before he murdered the plaintiffs' decedent, as well as almost $250,000 the same defendant's son came up from Florida to withdraw from joint bank accounts in Georgia three days after the defendant was arrested for the murder. As explained below, we hold that the trial court abused its discretion with respect to the house but not with respect to the bank account proceeds. Accordingly, we affirm in part and reverse in part.

1. On August 24, 2009, 76-year-old Richard Bishop pled guilty to the murder of his former caretaker-turned-lover, Gwendolyn Nutt. Nutt had moved in with Bishop during the course of their relationship; when she left him, she moved to another property that Bishop owned, living in a trailer that she soon began sharing with her new lover, Doyle Smith. Around the time that Nutt moved out, Bishop recorded a gift deed transferring his house, which was worth about $125,000, to his three minor grandchildren in Florida. He also listed the trailer property, which was worth about $25,000, for sale with two realty agents. Bishop continued living in the house for about three months after recording the gift deed.

On the night of August 12, 2009, Bishop confronted Nutt and Smith at the trailer. He shot and killed Nutt and shot and injured Smith. When interviewed by the police shortly after the murder, Bishop denied any involvement, but he agreed to show the police his gun collection, and the police recovered what they believed to be the murder weapon. On August 14, Bishop was arrested and denied bond.

Bishop's son Marshall lived in Florida. Marshall was the father of Kyle, one of the three grandchildren who owned Bishop's house as a result of the gift deed. Bishop and Marshall had nine joint accounts

worth close to $250,000 in several Georgia banks. On August 17, 2009, three days after his father's arrest, Marshall, who had come up from Florida, emptied and closed the nine joint accounts, incurring early withdrawal fees in the process, and returned to Florida.

One week later, on August 24, Bishop pled guilty to the malice murder of Nutt and aggravated assault against Smith. At the plea hearing, Bishop admitted that he had a sexual relationship with Nutt, that it ended and she moved out, and that on the night he killed her at the trailer, he had a heated argument with her about her infidelity. Bishop denied that he went to the trailer intending to kill Nutt. Instead, he said that he simply lost his temper and that Nutt would still be alive were it not for the fact that he had a loaded gun in the glove compartment of his pickup truck that night. Bishop was sentenced to life in prison and will not be eligible for parole for 30 years, when he would be 106 years old.

The following week, on September 2, 2009, Nutt's daughter filed suit on behalf of Nutt's estate and heirs ("the plaintiffs") against Bishop, the grandchildren who owned his house, and the realty agents engaged in selling the trailer property ("the defendants"). The verified complaint recounted some of the recent transfers, alleged that the plaintiffs intended to file a wrongful death lawsuit against Bishop, and claimed that the transfers were fraudulent and designed to put Bishop's assets beyond the reach of the court to satisfy the inevitable wrongful death judgment. The plaintiffs requested an emergency temporary restraining order (TRO) and other injunctive relief freezing the two properties, the proceeds from the joint bank accounts, and any other assets Bishop might have or have had in the six months prior to the murder. The plaintiffs asked that the injunction be directed against the defendants and anyone in active concert or participation with them.

The complaint was filed on a Friday, and the trial court granted the emergency TRO without a hearing the following Monday, September 4, 2009. The court set a hearing on an interlocutory injunction pending a final resolution of the case for September 24. On the day of the hearing, the defendants filed an answer to the complaint, and the plaintiffs filed their complaint for wrongful death against Bishop.[1] Attorney Jason B. Godwin appeared at the hearing on behalf of Bishop and the three minor grandchildren, and the two realty agents appeared pro se. Although not named as a defendant in either lawsuit, Marshall was personally served with process as guardian of his minor son, and thus he was notified of both the entry of the TRO and the

---

[1] It is unclear why the plaintiffs decided to file separate lawsuits, 20 days apart, alleging fraudulent transfer and wrongful death, instead of filing one lawsuit asserting both claims.

hearing on the interlocutory injunction. Marshall did not attend the hearing, however, and attorney Godwin made it clear on the record that he was not authorized to enter an appearance for Marshall.

No witnesses testified at the hearing. Instead, the plaintiffs submitted documents that were admitted into evidence and explained to the court what their investigation up to that point had revealed. Title searches for the house and trailer properties, bank records of the accounts Marshall had emptied and closed, and the transcript of Bishop's guilty plea hearing were admitted without objection.

Regarding their investigations up to that point, the parties largely agreed on the historical facts and sequence of events, disagreeing mainly about the inferences that could be drawn from the facts and the application of the legal rules governing fraudulent transfers and the issuance of interlocutory injunctions. Their only major factual disagreement related to when the romantic relationship between Bishop and Nutt had ended. The plaintiffs asserted in their verified complaint that Nutt moved out "[a]t the end of April/early May, 2009," a claim their counsel repeated at the hearing. The attorney for Bishop and the grandchildren disputed that claim, alleging that the breakup happened in June, several weeks after Bishop recorded the gift deed transferring his house to the grandchildren.

On October 2, 2009, the trial court entered a written order granting an interlocutory injunction which, among other things, barred the defendants, their agents, and anyone in active concert or participation with them with notice of the injunction, including Marshall, from "selling, transferring, removing, destroying, damaging, changing, alienating or otherwise encumbering" the house and trailer properties and "all bank accounts in the name of Defendant Richard Bishop, whether individually and/or jointly with any other or others and/or all monies received from said accounts." The defendants filed a timely notice of appeal to the Court of Appeals, which transferred the case to this Court on June 15, 2010. See Ga. Const. of 1983, Art. VI, Sec. VI, Par. III (2) (providing that the Supreme Court has appellate jurisdiction over "[a]ll equity cases").[2]

2. The defendants' first two enumerations of error relate to Marshall, Bishop's son. The defendants claim that because Marshall was not named as a defendant in the complaint, the trial court lacked

---

[2] After the filing of the appeal, proceedings continued in both the trial court and the appellate courts. The parties filed several motions in the Court of Appeals that were transferred here with the case. On December 7, 2009, the plaintiffs filed a motion to dismiss the appeal. On March 15, 2010, the defendants filed a motion for attorney fees, and on June 10, 2010, the defendants filed a motion for emergency supersedeas to stay a June 7, 2010 trial court order in the related wrongful death action, which granted the plaintiffs' motion to add

personal jurisdiction over him, and the interlocutory injunction reflects an impermissible attempt to enjoin a non-party extraterritorially (since Marshall lives in Florida). However, the defendants did not move to dismiss the complaint based on the failure to join a necessary party, see OCGA §§ 9-11-12 (b) (7), 9-11-19, and Marshall did not appear or move to intervene in the proceedings in the trial court, see OCGA § 9-11-24. In addition, Marshall did not request special permission to participate in the appeal even though he is a non-party, and the defendants have not even attempted to explain why they might have third-party standing to press arguments on Marshall's behalf. See *Lockey v. Bennett*, 244 Ga. 339, 340 (260 SE2d 56) (1979) (" 'Only parties to the proceeding below may be parties on appeal.' " (citation omitted)); *Feminist Women's Health Center v. Burgess*, 282 Ga. 433, 435 (651 SE2d 36) (2007) (adopting the federal test for third-party standing). Accordingly, we will not consider the defendants' first two enumerations of error.

In their third enumeration of error, the defendants contend that the interlocutory injunction must be reversed because it attempts to prevent withdrawals from the joint bank accounts that have already taken place. As to the accounts in question, however, the trial court's order is more fairly read not to enjoin the transfers that took place shortly after Bishop's arrest but instead to prohibit further disposition of the proceeds. Thus, this enumeration of error is meritless.

3. The defendants' five remaining enumerations of error contend that reversal is required because the plaintiffs failed to satisfy the four-part test for issuance of an interlocutory injunction, and that the trial court therefore abused its discretion in enjoining further disposition of the bank account proceeds and Bishop's house. In evaluating these claims, we first set out the standards applicable to interlocutory injunctions. Next, we consider the scope of Georgia fraudulent transfer law and the Georgia Uniform Fraudulent Transfers Act (Georgia UFTA) in particular. See OCGA §§ 18-2-70 to 18-2-80. Finally, we apply interlocutory injunction and fraudulent transfer law to the trial court's order regarding the bank account proceeds and the house.

(a) *Interlocutory Injunctions*: There are two types of injunctions, perpetual (permanent) and interlocutory. See generally OCGA §§ 9-5-1 to 9-5-11, 9-11-65 (a).[3] A permanent injunction can be entered

---

as defendants Marshall Bishop, one of the three grandchildren, and Bishop's sister and her husband. On June 29, 2010, we issued an order denying the plaintiffs' motion to dismiss the appeal and the defendants' motions for attorney fees and for emergency supersedeas.

[3] Interlocutory and permanent injunctions differ from temporary restraining orders, which may issue without notice to the opposing party in some situations and may last no longer than 30 days unless the party restrained consents. See OCGA § 9-11-65 (b). Unlike injunctions, temporary restraining orders are not immediately appealable as of right. See OCGA § 5-6-35

only "upon a final decree." OCGA § 9-5-10. An interlocutory injunction, by contrast, is a temporary remedy designed to preserve or restore the status quo and keep the parties from injuring one another until the court has had a chance to try the case. See *Chambers v. Peach County*, 268 Ga. 672, 673 (492 SE2d 191) (1997).

A court confronted with a request for an interlocutory injunction often will not have available all the evidence needed to fully and finally adjudicate the parties' claims and defenses. In some instances, as in this case, the request for an interlocutory injunction comes before formal discovery has even begun. An interlocutory injunction is an extraordinary remedy, and the power to grant it must be "prudently and cautiously exercised." *Parker v. West View Cemetery Assn.*, 195 Ga. 237, 242-243 (24 SE2d 29) (1943). However, to be effective, the decision to grant an interlocutory injunction must often be made under time constraints that do not allow for the careful deliberation and reflection that accompany a full trial on the merits. See id. Thus, the trial court must make a judgment call regarding the equities presented, and the court is vested with broad discretion in making that decision. See OCGA § 9-5-8 ("The granting and continuing of injunctions shall always rest in the sound discretion of the judge . . . ."). The grant or denial of an interlocutory injunction will not be reversed on appeal unless the trial court made an error of law that contributed to the decision, there was no evidence on an element essential to relief, or the court manifestly abused its discretion. See *Chambers*, 268 Ga. at 673; Christopher J. McFadden et al., Georgia Appellate Practice with Forms, § 6-16, pp. 205-206 (2008).

Four factors guide the court's decision. An interlocutory injunction should not be granted unless the moving party shows that: (1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of her claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest. See *Garden Hills Civic Assn. v. MARTA*, 273 Ga. 280, 281-282 (539 SE2d 811) (2000); *Rollins Protective Svcs. Co. v. Palermo*, 249 Ga. 138, 142 (287 SE2d 546) (1982). See also 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948 (2d ed. 1995) (hereinafter Wright & Miller). The first factor — substantial threat of irreparable injury if an

---

(a) (9) (requiring application for discretionary appeal to challenge "orders granting or denying temporary restraining orders"). The defendants do not challenge the trial court's issuance of the emergency TRO.

interlocutory injunction is not entered — is the most important one, given that the main purpose of an interlocutory injunction is to preserve the status quo temporarily to allow the parties and the court time to try the case in an orderly manner. See Wright & Miller § 2948.1.

(b) *Fraudulent Transfers*: Fraudulent transfer cases are especially amenable to interlocutory injunctive relief. See, e.g., *Edwards v. United Food Brokers*, 195 Ga. 1, 6-8 (22 SE2d 812) (1942). The goal of the interlocutory injunction in these cases is to prevent the defendant from putting his assets beyond the court's reach to satisfy an eventual judgment, thereby leaving the plaintiff "practically remediless." *Kinard v. Ryman Farm Homeowners' Assn.*, 278 Ga. 149, 149 (598 SE2d 479) (2004).

Relying on *Dortic v. Dugas*, 52 Ga. 231 (1874), the defendants argue that an interlocutory injunction is not available as a matter of law to restrain alleged fraudulent transfers where the only harm alleged is that the transfers might limit the plaintiffs' recovery on a pending claim for damages. However, it has long been the law that an interlocutory injunction may be granted to prevent a defendant from fraudulently transferring his assets and thereby putting them beyond the trial court's jurisdiction before the plaintiff's claim has been reduced to an enforceable judgment. Thus, in *Dortic* the Court said:

> No case can be found where an injunction, ad interim, has been granted to prevent the defendant from selling his own property, on which the complainant has no lien, or in which he has no interest, to await the establishment of the complainant's demand, *unless* there be special circumstances of contemplated fraud by the defendant.

Id. at 232 (emphasis added).

The case law was later codified. Thus, although "[c]reditors without liens may not, as a general rule, enjoin their debtors from disposing of property nor obtain injunctions or other extraordinary relief in equity," OCGA § 9-5-6, "[e]quity may enjoin the defendant as to transactions involving fraud," OCGA § 9-5-11. For example, as explained in *Kennedy v. W.M. Sheppard Lumber Co.*, 261 Ga. 145 (401 SE2d 515) (1991), in *Mitchell v. Hayden, Stone, Inc.*, 225 Ga. 711 (171 SE2d 280) (1969), we upheld an interlocutory injunction preventing the defendant from disposing of his assets, which allegedly included proceeds from the sale of stolen IBM stock, because the trial court found that the defendant otherwise "would be unable to respond to a judgment in the sum of one million dollars," the amount sought in the complaint. *Kennedy*, 261 Ga. at 146, n. 2.

Moreover, in 2002 the General Assembly enacted an additional tool for the detection, prevention, and remediation of fraudulent transfers, the Georgia UFTA, which is modeled on the Uniform Fraudulent Transfer Act promulgated by the National Conference of Commissioners on Uniform State Laws and adopted in various forms by 43 states and the District of Columbia. The Georgia UFTA broadly defines a "claim" as any "right to payment, whether or not the right is reduced to judgment," OCGA § 18-2-71 (3), and it specifically authorizes injunctive relief against further disposition of assets or other property that may be needed to satisfy a claim by the defendant, a transferee, or both, see OCGA § 18-2-77 (a) (3) (A).

In addition, the Georgia UFTA plainly states that it applies to transfers that were made with actual intent to defraud up to four years before a claim arose, see OCGA § 18-2-79 (1), as well as the more common situation where the claim arose first and the defendant then transferred assets to avoid a future judgment. Compare OCGA § 18-2-74 (addressing claims that arose "before or after" the alleged fraudulent transfer), with OCGA § 18-2-75 (a) (addressing only claims that arose "before" the alleged fraudulent transfer). See also *State Banking Co. v. Miller*, 185 Ga. 653, 656 (196 SE 47) (1938) ("Conveyances may be fraudulent as to subsequent creditors as well as existing creditors, if made with the intent to defraud."). Even before the enactment of the Georgia UFTA, this Court had held that asset transfers made in anticipation of the filing of a wrongful death action against a murderer may be set aside as fraudulent. See *Kesler v. Veal*, 257 Ga. 677, 677-679 (362 SE2d 214) (1987). And while not a common scenario, it was well established at the time the General Assembly enacted the Georgia UFTA that the model UFTA applied to "instances where one has conveyed his real property in anticipation of committing a tort which likely would involve a judgment against him." 5 Herbert T. Tiffany & Basil Jones, Tiffany on Real Property § 1324 (2010) (citing cases). See also Howard J. Alperin, *Conveyance as Fraudulent Where Made in Contemplation of Possible Liability for Future Tort*, 38 ALR3d 597 (1971). The official commentary to the uniform law confirms that, "[a]s under [the prior Uniform Fraudulent Conveyance] Act, the holder of . . . a contingent [tort] claim may be a creditor protected by this Act." Unif. Fraudulent Transfer Act § 1 cmt. 4, 7A ULA 654 (2004).

The fact that the alleged fraudulent transfer did not leave the defendant absolutely penniless is insufficient to defeat an interlocutory injunction. We have explained that " 'it is not enough that there is a remedy at law. It must be plain and adequate, or, in other words, as practical and as efficient to the ends of justice and its prompt administration as the remedy in equity.' " *Owens v. Ink Wizard Tattoos*, 272 Ga. 728, 729 (533 SE2d 722) (2000) (citation omitted).

Thus, where there is sufficient evidence of a fraudulent transfer to avoid full payment on an anticipated tort judgment, an interlocutory injunction may be granted to enjoin the defendant and those acting in concert with him from "further disposition ... of the asset transferred or of other property." OCGA § 18-2-77 (a) (3) (A).

The key issue under Georgia law before and under the Georgia UFTA is the transferor's actual intent to defraud at the time of the transfer. Because such fraud is rarely committed or admitted openly, actual intent to hinder, delay, or defraud creditors is seldom susceptible to direct proof. See Unif. Fraudulent Transfer Act prefatory note, 7A ULA 654 (2004). Thus, for centuries common law courts have relied on "badges of fraud" to determine whether a particular transfer was accompanied by the requisite fraudulent intent. As the United States Supreme Court has recounted:

> The modern law of fraudulent transfers had its origin in the Statute of 13 Elizabeth, which invalidated "covinous and fraudulent" transfers designed "to delay, hinder or defraud creditors and others." 13 Eliz., ch. 5 (1570). English courts soon developed the doctrine of "badges of fraud": proof by a creditor of certain objective facts (for example, a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration) would raise a rebuttable presumption of actual fraudulent intent. See *Twyne's Case*, 3 Coke Rep. 80b, 76 Eng. Rep. 809 (K.B. 1601); O. Bump, Fraudulent Conveyances: A Treatise upon Conveyances Made by Debtors to Defraud Creditors 31-60 (3d ed. 1882).

*BFP v. Resolution Trust Corp.*, 511 U. S. 531, 540-541 (114 SC 1757, 128 LE2d 556) (1994).

In this tradition, OCGA § 18-2-74 (b) now provides "a nonexclusive catalogue of factors appropriate for consideration by the court in determining whether the debtor had an actual intent to hinder, delay, or defraud one or more creditors." Unif. Fraudulent Transfer Act § 4 cmt. 5, 7A ULA 654 (2004).[4] Unlike the common law, however, the UFTA does not create a "rebuttable presumption" of fraud based on

---

[4] The non-exclusive list of statutory factors is as follows:
    (1) The transfer or obligation was to an insider;
    (2) The debtor retained possession or control of the property transferred after the transfer;
    (3) The transfer or obligation was disclosed or concealed;
    (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
    (5) The transfer was of substantially all the debtor's assets;

the existence of one or more of the eleven listed factors. Instead, the factors are treated as "relevant evidence as to the debtor's actual intent," from which the finder of fact may draw an inference of actual intent to defraud. Id. See *United States v. Leggett*, 292 F2d 423, 426 (6th Cir. 1961) ("The question of fraud involves the element of intent. . . . By reason of its nature, it is usually very difficult to prove fraud by direct evidence, and such proof is not necessary. The issue of fraud is commonly determined by certain recognized indicia, denominated 'badges of fraud,' which are circumstances so frequently attending fraudulent transfers that an inference of fraud arises from them." (citations omitted)).

(c) *The Joint Bank Accounts*: The trial court appears to have had little difficulty in concluding that it was appropriate to restrain, until the case could be tried, further disposition of the almost $250,000 in proceeds from the joint bank accounts withdrawn by Marshall Bishop after he traveled to Georgia three days after his father's arrest for murder. Likewise, we have no difficulty concluding that the trial court did not abuse its discretion as to this portion of the interlocutory injunction.

Of the eleven fraud factors listed in the Georgia UFTA, five are clearly relevant to the closing of the joint bank accounts by Marshall.[5] First, the transfer was to an insider — Bishop's son.[6] See

---

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

OCGA § 18-2-74 (b).

[5] We reject the defendants' argument that "[t]here was no evidence put forth of any transfer concerning the bank accounts; rather the only evidence shows that a joint account holder withdrew the money." The Georgia UFTA defines "transfer" broadly to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset and includes payment of money, release, lease, and creation of a lien or other encumbrance." OCGA § 18-2-71 (12). Before the bank accounts were closed, they were jointly owned by Bishop and Marshall, and both had equal access to the funds. The effect of withdrawing the funds and closing the accounts was to place the money solely under Marshall's control. The definition of a "transfer" is broad enough to encompass a co-owner's withdrawal of funds from a joint bank account.

[6] The Georgia UFTA defines "insider" to include, where the debtor is an individual, "[a] relative of the debtor," OCGA § 18-2-71 (7) (A) (i), and defines "relative" as "an individual related by consanguinity within the third degree as determined by the common law," OCGA § 18-2-71 (11).

OCGA § 18-2-74 (b) (1). Second, the almost $250,000 represented substantially all of Bishop's remaining assets in light of the transfer of his house to his grandchildren three months earlier. See OCGA § 18-2-74 (b) (5).[7] Third, Bishop did not receive reasonably equivalent value in return; the record does not indicate that Marshall gave Bishop any of the almost $250,000 from the joint accounts or anything else of value as consideration. See OCGA § 18-2-74 (b) (8). Fourth, the transfers were not openly disclosed and the location of the proceeds was unknown; indeed, the plaintiffs sought the injunction in part because they had not had an opportunity through discovery to locate the proceeds and wanted to ensure that they were not further concealed. See OCGA § 18-2-74 (b) (7). Fifth, and perhaps most telling, the accounts were closed just three days after Bishop was arrested and faced enormous tort liability for murdering Nutt — and closed with a sense of urgency, with Marshall traveling from Florida and paying early withdrawal fees to close some of the accounts. See OCGA § 18-2-74 (b) (10).

The factors enumerated in the statute are not exclusive, and one additional badge of fraud long recognized by the common law is also relevant here. Although there was no pending or formally threatened lawsuit when the accounts were closed three days after Bishop was arrested, see OCGA § 18-2-74 (b) (4), an attempt by Nutt's estate and heirs to seek restitution in the criminal case or recovery in a civil lawsuit was readily foreseeable, as the trial court discussed at the injunction hearing. See *Kesler*, 257 Ga. at 677-679; *Pergrem v. Smith*, 255 SW2d 42, 43-44 (Ky. 1953) (finding that a transfer was fraudulent and in anticipation of a lawsuit where the defendant struck a man with his car, causing him serious and permanent injuries, and seven days later sold a very expensive car to a relative for less than full value).

The trial court could infer from the many badges of fraud reflected in the circumstances of this case that the joint bank accounts were closed with the actual intent to hinder, delay, or defraud Nutt's estate and heirs of a full recovery for her wrongful death caused by Bishop. See OCGA § 18-2-74 (a) (1). The trial court therefore did not abuse its discretion in entering an interlocutory injunction barring further disposition of the proceeds from the joint accounts pending final disposition of the fraudulent transfer and wrongful death lawsuits.

---

[7] In addition, although the record is not completely clear, the guilty plea transcript suggests that Bishop represented that he was indigent a week after Marshall closed the joint bank accounts. See OCGA § 18-2-74 (b) (9). Bishop ultimately waived counsel and represented himself at the plea hearing.

(d) *The House*: The trial court's order does not explain the basis for including in the interlocutory injunction the house that Bishop transferred to his three grandchildren by gift deed three months before he murdered Nutt, but the hearing transcript provides some insight into the court's reasoning. After noting that the merits of the fraudulent transfer claims would be decided in due course, counsel for the plaintiffs asked the court to include the house in the interlocutory injunction to preserve the status quo to give him time to investigate opposing counsel's claims. The court responded that proving that the house was fraudulently transferred "may be a pretty tough ro[w] to hoe ultimately" but that "it was an unusual situation . . . where Mr. Bishop accepted responsibility rather quickly for his crime," which while "not unheard of" was "most unusual." The court thought it clear that the plaintiffs would win their wrongful death lawsuit and that it was "not unexpected that there would be substantial recovery." The court further found as to Bishop that "it appears there has been some kind of attempt here to, if not judgment-proof himself, to somehow divest himself of assets contemporaneously with or at the time of these events." In addition, the court found that "any injury to these defendants is outweighed by the potential injury to the plaintiffs" of not entering an interlocutory injunction and that "[i]t's clearly in the public interest to preserve those assets in this type of case, given the nature and the number apparently of defendants here that are involved and their out-of-state location." The court concluded: "We need to at least try to see if we can marshal what we have here and account for it."

The transfer of the house presents a closer question than the transfers from the joint bank accounts. Like the latter, the transfer of the house was made to insiders, and there is no indication that Bishop received reasonably equivalent value in return; indeed, the transfer was recorded as a gift. See OCGA § 18-2-74 (b) (1), (8). In addition, Bishop retained possession of the property after the transfer, a badge of fraud not present with the proceeds from the joint accounts. See OCGA § 18-2-74 (b) (2).

On the other hand, unlike with the joint accounts and in light of the almost $250,000 Bishop still held in those accounts at the time, it cannot be said that the house transfer represented substantially all of his assets or that it rendered him insolvent or close to it. See OCGA § 18-2-74 (b) (5), (9), (10). In addition, one of the factors weighs in Bishop's favor with respect to the house. It is undisputed that Bishop did not conceal that transfer. See OCGA § 18-2-74 (b) (7). To the contrary, he recorded the gift deed, publicly disclosing it.

Most significantly, however, the plaintiffs presented no evidence at the interlocutory injunction hearing that Bishop had plans to kill

Nutt when he executed the gift deed three months earlier. The plaintiffs' theory of fraudulent intent was based heavily on their allegation that Nutt moved out of the house shortly before Bishop executed the gift deed. As mentioned previously, the defendants disputed that allegation. The attorney for Bishop and his grandchildren stated as an officer of the court that he had seen, though he did not have with him, a letter in Nutt's handwriting to Marshall enclosing the gift deed and advising him to keep the deed with his important papers. The attorney noted that Bishop was legally blind due to macular degeneration and asserted that Nutt drove Bishop to the courthouse to record the gift deed on May 13, 2009. These representations, as well as a $500 check from Bishop to Nutt written on June 23, 2009, and cashed the next day, undermined the plaintiffs' claim that the relationship between Bishop and Nutt ended before Bishop gave his house to his grandchildren. Moreover, the direct evidence of Bishop's intention regarding the murder — the factual basis accepted in support of his guilty plea — was that he did not plan the murder in advance, much less three months in advance, but rather killed Nutt and shot Smith when he lost his temper during an angry encounter with them on August 12.

Even accepting the allegation that Bishop gave the house to his grandchildren after Nutt broke off their relationship — despite the evidence and proffer that contradict that claim — the plaintiffs' theory is that the 76-year-old Bishop, who was legally blind, in declining health, and had just lost his caretaker, openly gave his house to his grandchildren, who are the natural objects of his bounty, a full three months before murdering Nutt, as part of a plan to defraud her estate and heirs from recovering restitution in a criminal case or damages in a wrongful death action. Unlike the implications of fraudulent intent arising from the bank account transfers three days after Bishop's arrest for murder, the fatal flaw in this theory is that it does not explain why, if the murder was planned for three months and Bishop was trying to hide his assets, he would transfer the $125,000 house but keep $250,000 in his joint bank accounts and put his $25,000 trailer property up for sale rather than giving it to the grandchildren too. Thus, while the trial court could reasonably conclude that the bank account transfers occurred sufficiently "contemporaneously with or at the time of" the murder that created the plaintiffs' claim, the house transfer three months earlier stretches that connection too far. For these reasons, although the house transfer was accompanied by some badges of fraud, we conclude that the trial court abused its discretion in enjoining further disposition of the house.

Our view might change, of course, if additional evidence of fraud

comes to light. A trial court's findings and legal rulings at the interlocutory injunction stage are not final, and an interlocutory injunction may be dissolved or modified as the case develops. See *Frantz v. Piccadilly Place Condo. Assn.*, 278 Ga. 103, 104 (597 SE2d 354) (2004); *Univ. Health Svcs., Inc. v. Long*, 274 Ga. 829, 829 (561 SE2d 77) (2002). Likewise, the denial of an interlocutory injunction does not preclude a party from filing another request later if new evidence becomes available or the circumstances change such that there is a greater need for preliminary relief. See OCGA § 9-5-9 ("A second injunction may be granted in the discretion of the judge."). For example, at this point there is no allegation that the grandchildren have tried to transfer or sell the house and thereby move that asset further from the plaintiffs' reach. If they attempt to do so before trial, the trial court might consider that fact, along with any other changes in the evidence, in applying the test for granting an interlocutory injunction involving an allegedly fraudulent transfer.[8]

*Judgment affirmed in part and reversed in part. All the Justices concur.*

DECIDED FEBRUARY 28, 2011.

*Busch, Slipakoff & Schuh, Bryan E. Busch, Jason B. Godwin*, for appellants.
*Kristine E. Brown, L. David Wolfe*, for appellees.

---

[8] Similarly, according to the plaintiffs' counsel at oral argument, audiotapes of Bishop's phone calls from jail, which were discovered after the interlocutory injunction hearing, record Bishop asking Marshall, "Did you get all the money?" and "Do you have the cash?" This information, if true, was not before the trial court when it granted the interlocutory injunction and it is not properly in the record, so we do not consider it in upholding the injunction as it applies to the proceeds from the joint bank accounts. We note it only because if that sort of direct evidence of fraudulent intent relating to the house transfer came to light, it obviously could support an interlocutory injunction that included the house.