S10A2078. SRB INVESTMENT SERVICES, LLLP et al.
v. BRANCH BANKING AND TRUST COMPANY et al.
(709 SE2d 267)

NAHMIAS, Justice.

The appellants challenge an interlocutory injunction entered to preserve the status quo pending adjudication of the merits of appellee Branch Banking and Trust Company's ("BB&T") breach of contract and fraudulent transfer claims. We conclude that the trial court did not abuse its discretion in entering the interlocutory injunction, and so we affirm.

1. This case involves 16 loans that BB&T and its predecessors made between 2005 and 2007 to two companies, which were guaranteed by two other companies.[1] All four of those companies were controlled by father and son residential housing developers Stephen R. Been and Stephen S. Been. The loans were due to mature between March and May 2009. In mid-2007, the liquid assets securing the loans were transferred to two other companies controlled by the Beens, SRB Investment Services, LLLP ("SRB") and SFB Investment, LP ("SFB"). BB&T required SRB, SFB, and another company controlled by the Beens to sign as additional guarantors for the loans.[2] As part of the restructuring, SRB, SFB, and the three other guarantors signed liquidity covenants requiring them to maintain an

---

[1] The borrowers were Tampa Investment Group, Inc. and Legacy Investment Group, LLC, and the guarantors were Tampa Financial Company, Inc. and Legacy Communities, LLC. Although they are defendants in the trial court, these companies are not named in the interlocutory injunction and have not appealed.

[2] The third company required to sign as an additional guarantor was Legacy Communi-

aggregate of $35 million in cash and cash equivalents.

In mid-2008, as the U. S. housing market was suffering a historic collapse, the Beens authorized enormous "partnership distributions" from SRB and SFB. SRB and SFB's third and fourth quarter 2008 financial statements show that from June 30 to December 31, 2008, their collective assets shrank by $191 million or nearly 90%, from $216 million to $25 million. This left the guarantors in violation of the liquidity covenants, given the very limited assets of the other three guarantors. However, SRB and SFB withheld those financial statements from BB&T until January 7, 2009. By January 16, 2009, BB&T prepared a renewal package for the 16 loans that were scheduled to mature over the next few months, which would have required an immediate infusion of cash to increase the balances of SRB and SFB to the required $35 million in liquidity, but the Beens refused.

Negotiations between BB&T and the Beens continued over the next few months, as the financial situation of the Beens and their companies continued to worsen. On January 23, 2009, another lender filed suit to recover $22 million from the Beens, SRB and SFB, the borrowers and other guarantors on the 16 BB&T loans, two limited liability companies created by the Beens (SRB Management Company, LLC and SFB Investment Management, LLC), and three related entities. Despite the entry of a temporary restraining order, the defendants in that action continued to transfer away assets. On February 2, 2009, BB&T sent notices of default to SRB and SFB and the borrowers and other guarantors on the BB&T loans due to the violation of the liquidity covenants, although later that month BB&T briefly extended the maturity dates on ten of the sixteen loans. On February 19, 2009, a third lender, Bank of America, accelerated all of its loans to SRB, SFB, one of the two borrowers on the BB&T loans, the other three guarantors, and eleven affiliated entities; Bank of America later filed suit against them for $4.3 million. In addition, in May 2009, Stephen F. Been settled his divorce for $35 million.

On June 22, 2009, BB&T filed suit against SRB and SFB, the Beens, the original borrowers and guarantors on the 16 loans, the other additional guarantor added in 2007, and the two limited liability companies controlled by the Beens that were named in the other lender's lawsuit. BB&T sought to recover more than $19 million in principal and interest then outstanding on the loans. In addition to breach of contract, BB&T raised claims under the Uniform Fraudulent Transfers Act, OCGA §§ 18-2-70 to 18-2-80 (Georgia UFTA).

ties Group, Inc. This company also was not named in the interlocutory injunction and is not a party in this appeal.

Discovery commenced, but the Beens and their affiliates were not forthcoming. In March 2010, as a result of third-party subpoenas, BB&T learned that the Beens had created eight new limited liability companies between June 2008 and August 2009 — including four created on March 6, 2009, just before the BB&T loans were scheduled to begin maturing — and that the guarantors had transferred over $330 million to these and other unidentified entities and accounts, much of it between August 2008 and March 2009.[3] On April 26, 2010, BB&T filed a motion to amend the complaint to add the eight new LLCs as defendants and a motion for an interlocutory injunction freezing SRB and SFB's recently transferred assets.

The injunction hearing took place on May 27, 2010. By that time, the combined assets of SRB and SFB had fallen from $216 million in June 2008 to $25 million in January 2009, shortly before the BB&T loans would become due, to just $25 *thousand* in May 2010. The parties stipulated to certain facts, including the sharp decline in SRB and SFB's assets, and documentary evidence was introduced. On June 20, 2010, the trial court issued an interlocutory injunction naming the Beens, SRB and SFB, the two LLCs that had been sued by the other lender and that were named in the original complaint, and the eight recently created LLCs (collectively, "the enjoined parties").[4]

The injunction froze $24 million in assets originating from SRB and SFB in the possession, custody, or control of the enjoined parties and anyone with notice in active concert or participation with them. The order excepted payments made in the ordinary course of business or financial affairs or pursuant to a valid court order. In addition, the order explained that the enjoined parties could avoid the asset freeze by depositing $25 million into the registry of the court or obtaining a $25 million irrevocable standby letter of credit. The enjoined parties did neither. Instead, they appealed.[5]

2. The enjoined parties do not seriously dispute that the stipulations and documentary evidence presented to the trial court were sufficient, at the interlocutory injunction stage, to support a finding that numerous badges of fraud exist with respect to the transfers at issue here. Because actual intent to defraud is difficult to prove, the

---

[3] The LLCs are SRB Investment Management Group, LLC; Galleon Investment Group, LLC; Calamondon, LLC; SFB Financial Group, LLC; Forrest Investment Group, LLC; Forrest Holdings, LLC; Treasure Coast Investment Partners, LLC; and DCH Investments, LLC.

[4] Builder's Finance Group, Inc., another recently created LLC controlled by a close associate of the Beens, was also named in the interlocutory injunction but did not appeal.

[5] In September 2010, the trial court ruled on the parties' motions for summary judgment, holding the defendants liable to BB&T for seven of the sixteen notes at issue, which reduced the amount frozen from $24 million to $21 million. Both BB&T and the defendants indicate that they are appealing the summary judgment order separately.

Georgia UFTA lists 11 nonexclusive factors (sometimes called "badges of fraud") that can be considered in determining whether funds were transferred with the actual intent to defraud a creditor. See OCGA § 18-2-74 (b) (1)-(11); *Bishop v. Patton*, 288 Ga. 600, 607 (706 SE2d 634) (2011).

At least seven statutory badges of fraud are implicated here: (1) all of the transfers BB&T could trace went to entities the Beens control; (2) the Beens remained in possession or control of the transferred assets after those transfers; (3) the transfers were executed covertly and the Beens and their affiliates refused to provide details when BB&T asked about them and then resisted formal discovery; (4) during and shortly after the transfers, two creditors, as well as BB&T, threatened and then initiated lawsuits against SRB, SFB, and affiliated entities; (5) by the time of the interlocutory injunction hearing, the transfers included substantially all of the assets of SRB and SFB, the entities responsible for holding the vast majority of the liquid assets securing the 16 loans; (6) the transfers rendered SRB and SFB insolvent; and (7) during and shortly after the transfers, many of the Beens' and their affiliates' obligations were demanded or matured, exposing them to a substantial amount of imminently payable debt. See OCGA § 18-2-74 (b) (1), (2), (3), (4), (5), (9), (10). BB&T also presented evidence, as a nonstatutory badge of fraud, of SRB and SFB's pattern of maintaining just enough funds in certain accounts to satisfy their financial covenants at the end of each quarter and then transferring the funds away shortly thereafter. See *Bishop v. Patton*, 288 Ga. at 609 (noting that "[t]he factors enumerated in the statute are not exclusive"). Thus, the evidence presented to the trial court showed the existence of multiple badges of fraud, which the Georgia UFTA treats as " 'relevant evidence as to the debtor's actual intent,' from which the finder of fact may draw an inference of actual intent to defraud." Id. at 608.[6]

"Fraudulent transfer cases are especially amenable to interlocutory injunctive relief." *Bishop v. Patton*, 288 Ga. at 605. Accordingly, "[s]ubject to applicable principles of equity and . . . civil procedure," the trial court was authorized to enter an interlocutory injunction

---

[6] Because we hold that the evidence was sufficient, at least at the interlocutory injunction stage, to prove actual fraud under OCGA § 18-2-74 (b), we need not address BB&T's alternative claim that the transfers were fraudulent under OCGA § 18-2-75 (a), which provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

"against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property." OCGA § 18-2-77 (a) (3) (A).

3. The appellants contend that even if the evidence was sufficient to show that the challenged transfers were made with "actual intent to hinder, delay, or defraud any creditor of the debtor," OCGA § 18-2-74 (a) (1), the trial court nevertheless erred in entering the interlocutory injunction. The appellants claim that we must reverse the grant of the interlocutory injunction for three reasons: (a) BB&T had an adequate remedy at law in the form of an action for damages; (b) BB&T was guilty of laches; and (c) the status quo was not in danger or in need of preservation.

In deciding whether to issue an interlocutory injunction, the trial court should consider whether:

> (1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of her claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest.

*Bishop v. Patton*, 288 Ga. at 604.[7] Although an interlocutory injunction is an extraordinary remedy, and the power to grant it must be " 'prudently and cautiously exercised,' " the trial court is vested with broad discretion in making that decision. Id. at 604 (citation omitted). We will not reverse the trial court's decision to grant or deny an interlocutory injunction "unless the trial court made an error of law that contributed to the decision, there was no evidence on an element essential to relief, or the court manifestly abused its discretion." Id.

(a) The appellants' primary argument for reversal is that BB&T has an adequate remedy at law because it can sue for money damages or foreclose on the property securing the original loans. See, e.g., *Allen v. Hub Cap Heaven, Inc.*, 225 Ga. App. 533, 540 (484 SE2d 259) (1997) ("[I]t is error to grant an injunction when the party seeking it has an adequate remedy at law."). We recently explained that the ultimate availability of a judgment for money damages has never precluded an interlocutory injunction when fraudulent transfers are

---

[7] To the extent that our opinion in *Bishop v. Patton*, 288 Ga. at 604, may be read as requiring the moving party to prove all four of these factors to obtain an interlocutory injunction, it is hereby disapproved.

at issue. See *Bishop v. Patton*, 288 Ga. at 604, 607. While "[c]reditors without liens may not, as a general rule, enjoin their debtors from disposing of property nor obtain injunctions or other extraordinary relief in equity," OCGA § 9-5-6, long before the enactment of the Georgia UFTA in 2002, Georgia law provided, as an exception to this rule, that "[e]quity may enjoin the defendant as to transactions involving fraud," OCGA § 9-5-11. See *Bishop v. Patton*, 288 Ga. at 605. When a money judgment is likely to be uncollectible because a debtor has fraudulently moved its assets in an attempt to dissipate or conceal them from a creditor, Georgia law, both before and under the Georgia UFTA, gives the creditor the right to seek interlocutory relief by freezing the assets where they are.

The appellants argue that the rule should be different for a secured creditor like BB&T, arguing by analogy to a supersedeas bond in a civil case, which they claim has the same function as an interlocutory injunction under the Georgia UFTA. They note that by statute, a supersedeas bond is unavailable if the amount at issue is "otherwise secured." OCGA § 5-6-46 (a). However, the Georgia UFTA contains no such limitation, nor did this limit exist under prior equity law, and we decline to read into the statute the phrase "otherwise secured" simply because that phrase appears in the supersedeas statute. To the contrary, we presume that its omission from the equity statutes and the Georgia UFTA was intended. See *Fair v. State*, 284 Ga. 165, 167-168 (664 SE2d 227) (2008).

Moreover, as BB&T argues, this Court has long held that a creditor holding a promissory note secured by real property may *either* sue on the note *or* foreclose " 'until the debt is satisfied.' " *Oliver v. Slack*, 192 Ga. 7, 8 (14 SE2d 593) (1941). Georgia's policy giving secured creditors a choice of remedies would be thwarted if the borrower could force the secured creditor to foreclose on its collateral, irrespective of its current value, by voluntarily and fraudulently rendering itself insolvent. Foreclosing on collateral of uncertain remaining value, going through confirmation proceedings, and suing the insolvent appellants to reclaim the deficiency — and then having to recover the fraudulently transferred assets to collect on the ensuing judgment — is not an *adequate* remedy at law, because it is not nearly " " " "as practical and as efficient to the ends of justice and its prompt administration as the remedy in equity" " ' " — enjoining further transfers temporarily so that BB&T could collect a final judgment. *Bishop v. Patton*, 288 Ga. at 607 (citations omitted).

(b) The appellants also contend that the interlocutory injunction was barred by laches. "Laches bars an equitable claim 'when the truth cannot be established fairly due to a long delay . . . .' " *Thompson v. Central of Ga. R.R.*, 282 Ga. 264, 266 (646 SE2d 669) (2007) (citation omitted). Thus, OCGA § 9-3-3 provides that "courts of equity may

interpose an equitable bar whenever, from the lapse of time and laches of the complainant, it would be inequitable to allow a party to enforce his legal rights." The appellants assert that it was inequitable to give BB&T injunctive relief, because BB&T knew of the challenged distributions in January 2009 but waited another 16 months to amend the complaint and seek an interlocutory injunction.

However, "laches does not arise from delay alone. To prevail on a plea of laches, prejudice, too, must be shown." *Stone v. Williams,* 265 Ga. 480, 480 (458 SE2d 343) (1995). As BB&T correctly points out, the appellants presented no evidence of harm from the delay. In their brief on appeal, the strongest argument the appellants can muster in support of their claim of prejudice is that "[h]ad Appellee moved for an injunction in January of 2009 or even when it filed its Complaint in June of 2009, *some* of the Appellants *may* not have begun operations and others *may* have adjusted their business models accordingly." (Emphasis added.) Vague assertions of harm like these, supported by no citation to evidence in the record, are insufficient to sustain a defense of laches. That is particularly true here, because the interlocutory injunction exempted "payments made in the ordinary course of business or financial affairs (e.g., payroll, attorneys' fees and expenses, and other ordinary business and household expenses) and pursuant to any other valid court order."

The appellants' laches argument also ignores the obstacles that BB&T faced in becoming fully informed of its rights until shortly before it requested the injunction, including the appellants' efforts to frustrate discovery. BB&T did not sit idly by in the 16 months between the delayed receipt in January 2009 of the SRB and SFB financial statements showing the massive "partnership distributions" in the previous two quarters and the April 2010 filing of the motion for an interlocutory injunction. In that time, BB&T investigated the appellants' conduct so that it could file its original complaint in good faith, served discovery, defended against early dispositive motions, served third-party discovery after the appellants refused to provide relevant information, defended against a motion to quash the third-party discovery, and reviewed the documents that were finally produced. Until that time, BB&T had been unable to identify many of the recipients of the fraudulent transfers, which were a host of newly formed entities. Armed with the third-party discovery responses, BB&T was able to serve pointed interrogatories on the appellants and learn and document the details of the fraudulent transfer scheme for the first time. And around the same time, BB&T obtained new information from the Beens' depositions.

There is a balance between a plaintiff's knowing that a cause of action exists and that interim injunctive relief may be needed and sitting on its rights to the prejudice of the defendant. Here, the

evidence before the trial court showed that the delay resulted primarily from the appellants' concealment of their actions and obstruction of BB&T's efforts to discover the details. The trial court had the discretion to accept BB&T's argument that it was appropriate not to "shoot first and aim second." There was no intentional or careless delay. As BB&T explained at the interlocutory injunction hearing:

> We wanted to get as much information as we could before coming to this point, and we feel that under the circumstances, we have done all that we could to gather as much information as we could so that we would be in an informed position today before seeking the relief which we seek.

The trial court was entitled to accept that explanation and reject the laches defense.

(c) Finally, the appellants contend that an interlocutory injunction was not available because "[t]he only appropriate purpose for granting an interlocutory injunction is to preserve the status quo of the parties pending a final adjudication of the case." *Ga. State Licensing Bd. for Residential & General Contractors v. Allen*, 286 Ga. 811, 818 (692 SE2d 343) (2010). Accord *Bishop v. Patton*, 288 Ga. at 605 ("The first factor [that guides the trial court in deciding whether to grant an interlocutory injunction] — substantial threat of irreparable injury if an interlocutory injunction is not entered — is the most important one, given that the main purpose of an interlocutory injunction is to preserve the status quo temporarily to allow the parties and the court time to try the case in an orderly manner."). The appellants claim that BB&T made no showing that the status quo was endangered or in need of preservation.

This argument is puzzling in light of the important role that interlocutory injunctions play when fraudulent transfers are alleged. As we said in *Bishop v. Patton*, "[f]raudulent transfer cases are especially amenable to interlocutory injunctive relief." 288 Ga. at 605. As explained above, the evidence supported a finding that SRB and SFB had moved virtually all of their assets — hundreds of millions in dollars — to a series of recently formed entities and other recipients with "actual intent to hinder, delay, or defraud" creditors and were likely to continue doing so. OCGA § 18-2-74 (a) (1). The purpose of the interlocutory injunction was to freeze the fraudulently transferred assets in place and thereby "prevent the defendant[s] from putting [their] assets beyond the court's reach to satisfy an eventual judgment, thereby leaving the plaintiff 'practically remediless.'" See *Bishop v. Patton*, 288 Ga. at 605.

The appellants' argument that there was no threat to the status quo because similar distributions had been made in the past ignores

several key differences. First, the earlier distributions occurred before SRB and SFB were required to be added as additional guarantors on the 16 loans. Second, the earlier distributions did not cause any debtor to violate its liquidity covenants with BB&T. Finally, the earlier distributions did not render SRB or SFB so poorly capitalized as to be essentially insolvent relative to maturing liabilities. The challenged transfers bear little resemblance to the earlier distributions cited by the appellants, and the trial court did not abuse its discretion by safeguarding the status quo pending final resolution of BB&T's claims.

*Judgment affirmed. Hunstein, C. J., Carley, P. J., Benham, Thompson and Melton, JJ., and Judge Michael P. Boggs concur. Hines, J., not participating.*

## DECIDED MARCH 25, 2011.

*Fellows LaBriola, Eugenia W. Iredale, Steven M. Kushner, Chilivis, Cochran, Larkins & Bever, Brian F. McEvoy, John D. Dalbey, Kevin A. Maxim, Simon H. Bloom, Stephanie A. Everett*, for appellants.

*Greenberg Traurig, Jennifer B. Moore, Mark G. Trigg, Lee B. Hart*, for appellees.