In the Supreme Court of Georgia

Decided:    June 29,  2015

S15A0142. DAVIS v. VCP SOUTH, LLC et al.
S15X0143. VCP SOUTH, LLC et al. v. DAVIS et al.

THOMPSON, Chief Justice.

Appellant Lori Davis, individually and as personal representative of the Estate of Keith L. Davis, M.D., appeals three orders entered by the Columbia County Superior Court on March 7, 2014, April 1, 2014, and April 21, 2014, granting mandatory interlocutory injunctions against her and holding her in civil and criminal contempt in an action brought against her husband's estate by Steven M. Roth, M.D. ("Roth") and two Georgia limited liability companies Roth co-owned with Keith Davis ("Davis").  The plaintiffs filed suit against appellant and the Davis Estate seeking to enforce certain provisions of the companies' operating agreements giving Roth, as the surviving member of the LLCs, an option to purchase Davis' interests, and to otherwise establish the rights of the parties, including the ownership of certain trademarks.  Appellant also appeals from an order entered April 21, 2014 in which the trial court

adopted the Third Report of the Special Master and limited discovery in the pending case. Appellees, VCP South, LLC, VCP Raleigh, LLC and Mary Anne Roth, individually and as Executrix of the Estate of Steven M. Roth, M.D. cross-appeal alleging the trial court erred in allowing the Davis Estate to maintain an ownership interest in the LLCs past the time provided for in the operating agreements, and in allowing the distribution of LLC profits accruing after Davis' death to the Davis Estate. For the reasons set forth below, we affirm the decisions of the trial court.

The facts of this case are as follows: In 2004, plastic surgeons Davis and Roth formed VCP South, LLC, a joint vein care practice located outside Augusta, Georgia, with each doctor owning fifty percent of the membership units of the LLC pursuant to the terms of an operating agreement signed by the parties. Drs. Davis and Roth thereafter formed other related limited liability companies and opened additional vein care practices in neighboring states. The doctors heavily advertised their services and developed a lucrative business, becoming known as "The Vein Guys." VCP South contracted with a marketing company to apply for federal trademark protection for a number of trademarks utilized by the medical practices, including "Vein Care Pavilion," "Vein Care

2

Pavilion of the South," "The Vein Guys," "We're So Vein," "Real Talk," and "Total Vein Care." Unbeknownst to Roth, and despite the fact that the marketing company was paid by VCP South, these trademarks were placed solely in the name of Davis.

Davis died suddenly on January 2, 2010. Under the terms of VCP South's operating agreement, Roth, as the surviving member of the LLC, had a first option to purchase all or part of the membership units owned by Davis. Absent an agreement as to value, the operating agreement provided that the value of the membership units would be determined in a commercially reasonable manner by the certified public accountant regularly representing the practice. The option existed for a period of ninety days following the date of qualification of the personal representative of the estate of the deceased doctor and, following the appointment of Davis' wife as personal representative of his estate on October 1, 2010, Roth sought to exercise his options to purchase Davis' membership units in VCP South, as well as in the other LLCs,[1] on or about November 11, 2010. When negotiations between appellant and Roth broke

---

[1] Although the primary operating agreement at issue in this case is the one associated with VCP South, LLC, there were separate, but similar, operating agreements executed by the doctors in various other entities.

3

down, Roth, VCP South and VCP Raleigh, LLC filed suit against the Davis Estate on December 3, 2010, seeking, inter alia, to enforce the provisions of the operating agreements and to obtain a ruling that various trademarks obtained and utilized by the medical practice since 2004 belonged to VCP South. Appellant answered the complaint, responding in part that the LLCs' accountant, Steven Staley, should not be allowed to do the valuation because he continued to provide services to the LLCs and to Roth and thus had a conflict of interest. The trial court disagreed, granting partial summary judgment to the plaintiffs on this issue and authorizing Staley to decide the fair market value of Davis' interest.

After Staley's valuation[2] was completed in September, 2011, the trial court appointed a special master to consider, inter alia, the Davis Estate's objections to the valuation as well as other issues regarding the extent of the estate's interests in the LLCs during the pendency of the litigation. The Special Master issued a report on December 12, 2011, finding that pursuant to the terms of the operating agreement, Davis ceased to be a member of the LLCs on the day

---

[2] Staley set the value of Davis' membership units in VCP South at $2,578,693. This valuation did not list any trademarks among the assets of VCP South.

he died and his estate thereafter maintained only financial rights, including (1) the right to share in the profits and losses of the company, (2) the right to interim and terminating distributions, and (3) the right to capital interest, "until such time as a closing occurs to purchase his Membership Units." Noting that the agreement set no time limit within which the closing had to occur, but recognizing that a party could unreasonably protract the purchase of the ceased member's interest, as well as that the company had complete control over when and how quickly a valuation could be done, the Special Master determined that a reasonable cutoff date for the allocation of profits and losses and entitlement to distributions "should be the last day of the month when a commercially reasonable value is determined," because, pursuant to the operating agreement, once the purchase price was established, the Davis Estate had no choice but to accept the price. The Special Master thus determined that if Staley's valuation was found to have been done in a commercially reasonable manner, then September 30, 2011, the last day of the month when the Davis Estate was presented with this valuation, would be the appropriate cutoff date for the Davis Estate's financial rights.

Thereafter, by order entered May 3, 2012, the trial court adopted the

Special Master's report and granted partial summary judgment to the plaintiffs with respect to the valuation of Davis' membership units for purchase by Roth. Appellant appealed, and the trial court's grant of summary judgment to the plaintiffs on this issue was affirmed by the Court of Appeals. See Davis v. VCP South, LLC, 321 Ga. App. 503 (740 SE2d 410) (2013).[3] Finally, on December 18, 2013, the closing sale of Davis' membership units to Roth was accomplished.[4]

Despite the fact that the issue regarding ownership of the trademarks remained pending in the case, on March 6, 2014, appellant, through a representative, contacted Facebook and, claiming ownership and asserting

---

[3] While awaiting the Court of Appeals' ruling, Roth and several employees of VCP South were killed in a February 20, 2013 plane crash. As a result, Roth's widow, Mary Anne Roth, was appointed representative of his estate on February 25, 2013 and, as executrix, was added as a plaintiff to the litigation. Shortly thereafter, Mrs. Roth, as representative of the Roth estate, executed two resolutions amending the LLC operating agreements to provide that she could become a member of the LLCs and thereby avoid their dissolution.

[4] After the Court of Appeals issued its decision on March 26, 2013, sale of Davis' membership units to Roth (now the Roth Estate) was further delayed when it was discovered that the Davis Estate no longer had any ownership interest in the membership units of VCP South because appellant had obtained a Probate Order of Year's Support transferring all of the assets of the Davis Estate to herself and her children. Various motions were filed by the parties and, following entry of a trial court order requiring appellant and the Davis children to be named individually as parties, appellant obtained an order from the probate court setting aside the year's support order and re-vesting ownership of the membership units in the Davis Estate.

6

trademark infringement, had the *The Vein Guys* Facebook page disabled and taken down. Facebook sent an email notification to VCP South's website manager stating that Facebook would only be able to restore content to *The Vein Guys* page if it received "explicit notice of consent from the complaining party." A Motion for Emergency Injunctive Relief was filed by the plaintiffs and heard by the trial court on March 7, 2014. Finding the plaintiffs would suffer irreparable harm and damages, the trial court entered an order that day requiring appellant to immediately notify Facebook to "reinstate and put back up 'The Vein Guys' page instanter" and to immediately advise the court when such reinstatement was accomplished.[5]

The Facebook page remained disabled, however, and plaintiffs filed a motion for contempt on March 13, 2014.[6] Following a hearing on March 26, 2014, the trial court entered an order on April 1, 2014 declining to hold

---

[5] The trial court deemed this March 7, 2014 order to be in the nature of a temporary restraining order and characterized the March 26, 2014 hearing as the hearing on the interlocutory injunction.

[6] When the Facebook page had not been reinstated by mid-morning on March 11, 2014, plaintiffs' counsel faxed a letter to appellant's counsel in the pending case, as well as to the Estate's attorney responsible for initiating the complaint with Facebook, inquiring about reinstatement of the page. Later that day, plaintiffs' counsel received a copy of an email which had been sent to Facebook less than an hour earlier attaching the trial court's March 7th order and requesting that *The Vein Guys* Facebook page be put up immediately.

appellant in contempt, but granting an interlocutory injunction requiring her to take affirmative action to "comply explicitly" with Facebook's original instructions for obtaining restoration of the Facebook page.[7] The trial court's order further provided that the Facebook page was to be reactivated no later than April 4, 2014, or beginning April 5, 2014, the court would assess a penalty of $1,000 per day against appellant until the page was restored.

When the Facebook page was not timely activated, the plaintiffs filed a motion for reconsideration which was heard by the trial court on April 14, 2014. At this hearing, appellant's attorney announced that the Facebook page had been reactivated that day. Thereafter, on April 21, 2014 the trial court entered its Second Order on Interlocutory Injunction and Contempt finding appellant in both civil and criminal contempt of its previous order and enjoining her, personally or through her attorneys or intermediaries, from (1) contacting Facebook without court approval regarding *The Vein Guys* Facebook page; and

---

[7] The pertinent Facebook instructions provided:

If an agreement is reached to restore the reported content, please have the complaining party email us with their consent and include the original reference number. We will not be able to restore this content to Facebook unless we receive explicit notice of consent from the complaining party.

(2) permitting any other entity (with one limited exception not relevant to this appeal) to use the disputed trademarks. The order further required appellant to produce all licenses, contracts and other documentation between appellant and others related to use of any of the disputed trademarks, and provided that the trial court would entertain a motion for attorneys fees by the plaintiffs in connection with the Facebook page dispute.

Also on April 21, 2014, the trial court issued its Order on Special Master's Third Report and Other Matters in which it adopted, in major part, the Third Report of the Special Master as the judgment of the court. Among other things, the trial court held that VCP South had been purchased as of September 30, 2011 from the Davis Estate based on the company's operating agreement and previous rulings of the court, thus the Davis Estate was not entitled to any distributions from the company accruing after that date. Further, the court concluded that any actions taken by VCP South or its members after September 30, 2011 were irrelevant to the matters before the court. Based on this determination, the trial court disallowed discovery for activities, transactions and events occurring after September 30, 2011 and denied appellant's motion to add Mary Anne Roth, individually, as a party to the action, finding Mrs. Roth

had no interest or control of the entities until after this cut-off date. Finally, the trial court ordered that the issues regarding ownership and use of the disputed trademarks be submitted to the Special Master for determination.

Case No. 15A0142.

1.    Appellant contends the trial court erred when it granted the plaintiffs/appellees' request for emergency relief following Facebook's deactivation of *The Vein Guys* Facebook page at appellant's request.

(a)    Appellant first asserts the trial court erred in entering its March 7, 2014 temporary restraining order and, thereafter, its April 1, 2014 order granting injunctive relief because the plaintiffs' request for injunctive relief was neither verified nor accompanied by sufficient affidavits. The record reveals, however, that the trial court found satisfactory proofs supported the granting of these orders and, in any event, the trial court allowed the plaintiffs' to perfect the record by filing a verification as an amendment to their motion. Accordingly, this claim lacks merit. See OCGA § 9-10-110.[8] See also DRST Holdings, Ltd.

---

[8]  OCGA § 9-10-110 provides:

Petitions for a restraining order, injunction, receiver, or other extraordinary equitable relief shall be verified positively by the petitioner or supported by other satisfactory proofs.

v. Brown, 290 Ga. 317 (1) (720 SE2d 626) (2012) ("It is well settled that the failure to verify a pleading is an amendable defect. [Cits.]").

(b) Appellant next claims the evidence was insufficient to show that she and/or her representatives had the power to make Facebook re-post *The Vein Guys'* Facebook page as ordered by the trial court, thus the court abused its discretion in issuing its April 1, 2014 order granting injunctive relief. "The purpose for granting interlocutory injunctions is to preserve the status quo, as well as balance the conveniences of the parties, pending a final adjudication of the case." Grossi Consulting, LLC v. Sterling Currency Group, LLC, 290 Ga. 386, 388 (722 SE2d 44) (2012) (quoting Benton v. Patel, 257 Ga. 669, 672 (362 SE2d 217) (1987)). The power of a trial court to grant a request for interlocutory injunctive relief is discretionary and based on the circumstances of each case. See OCGA § 9-5-8. Although this power must be prudently and cautiously exercised, this Court will not disturb an injunction fashioned by the trial court absent a manifest abuse of discretion. See Grossi Consulting, supra at 387-388 (1). In deciding whether to issue an interlocutory injunction, a trial court should consider four factors:

(1) whether there exists a substantial threat that a moving party will

suffer irreparable injury if the injunction is not granted; (2) whether the threatened injury to the moving party outweighs the threat and harm that the injunction may do to the party being enjoined; (3) whether there is a substantial likelihood that the moving party will prevail on the merits at trial; and (4) whether granting the interlocutory injunction will not disserve the public interest.

See SRB Inv. Svcs. v. Branch Banking and Trust Co., 289 Ga. 1, 5 (3) (722 SE2d 44) (2011).

Here, the trial court found that appellant's actions caused Facebook to de-activate *The Vein Guys* Facebook page and that absent entry of an injunction, plaintiffs would suffer irreparable harm. Evidence in the record showed a significant drop in the number of new patients contacting the practice following the deactivation of the Facebook page when compared to the number of new patient contacts received by the practice in the preceding two months. According to the affidavit of Kelly Vann, CEO of VCP South, LLC, even a 5% decrease in the number of new patients costs the practice over $60,000 per month. In comparison, there was no evidence that restoration of the Facebook page would harm appellant. Rather, the trial court specifically noted that the harm to the plaintiffs outweighed any action required of appellant to comply with the injunction. The trial court further determined there was a substantial

likelihood the plaintiffs would prevail on the merits regarding ownership or right of use to the trade name "The Vein Guys," and expressed concern that appellant's representative deliberately chose to obfuscate the status of a disputed issue pending before the court in order to convince Facebook to take action altering the status quo. Finally, the trial court observed that the interlocutory injunctions requested by the plaintiffs would not disserve the public interest.

As evidence in the record supports the trial court's findings, as well as its determination that appellant failed to follow the court's previous order requiring her to strictly comply with Facebook's instructions to have the Facebook page restored, the interlocutory injunction granted by the trial court requiring appellant to take the specific steps necessary to have *The Vein Guys'* Facebook page restored within a time limit established by the court did not constitute a manifest abuse of the trial court's discretion

(c) Finally, appellant argues that because *The Vein Guys* Facebook page was re-posted by April 14, 2014, there was no further need for the injunctive relief sought, thus the trial court's April 21, 2014, entitled "Second Order on Interlocutory Injunction and Contempt," constituted an even greater abuse of discretion. See Bruce v. Wallis, 274 Ga. 529, 531 (556 SE2d 124) (2001)

(finding it an abuse of discretion for the trial court to enter an injunction when the object of the injunction had been alleviated).  Appellant additionally claims that the relief granted in this order was far broader than that requested by the plaintiffs, and she asserts no evidence was tendered by the plaintiffs to substantiate their entitlement to such relief.

Given evidence in the record showing that appellant repeatedly failed to fully comply with trial court's orders until right before the contempt hearing held April 14, 2014,[9] that the issue concerning ownership of the trademarks remained pending before the trial court and had been pending since the beginning of the lawsuit, and that appellant and her agents did, in fact, have the power to obtain restoration of the Facebook page by simply following Facebook's directions, we do not find that the trial court abused its discretion in granting the interlocutory injunctive relief set forth in this order.  Nor, under the circumstances, can we say that the trial court's action enjoining appellant from contacting Facebook in the future regarding *The Vein Guys* Facebook page without prior court approval or from permitting other entities to use the disputed

---

[9] It was not until April 13, 2014 at 10:26 p.m., that appellant's attorney, Timothy E. Moses, who was "the complaining party," notified Facebook of his explicit consent to restoration of *The Vein Guys* Facebook page.  *The Vein Guys* Facebook page was reactivated by Facebook the next day.

trademarks was not needed. Rather, it appears that the relief granted by the trial court affects appellant's rights no more than necessary to preserve the status quo and to protect plaintiffs from the threatened harm associated with continued attempts by appellant to enforce her trademark claims outside the confines of the pending litigation. See Grossi Consulting, supra, 290 Ga. at 389.

2. Appellant contends the trial court erred in finding her to be in both civil and criminal contempt for failing to strictly comply with the trial court's orders. We disagree.

In order to be held in contempt, one must wilfully disobey the court's decree or judgment. See Simpkins v. Simpkins, 278 Ga. 523, 523 (603 SE2d 275) (2004). "Criminal contempt imposes unconditional punishment for prior acts of contumacy, whereas civil contempt imposes conditional punishment as a means of coercing future compliance with a prior court order. [Cits.]." American Medical Security Group, Inc. v. Parker, 284 Ga. 102, 105 (663 SE2d 697) (2008). It is for the trial court to determine whether a contempt has been committed, and that court's adjudication will not be interfered with unless there has been an abuse of discretion. See Berman v. Berman, 232 Ga. 342, 342 (206 SE2d 447) (1974).

15

Here, the record shows that appellant failed to follow the trial court's instructions in its March 7, 2014 order to immediately take action to have *The Vein Guys'* Facebook page reactivated. Subsequently, appellant failed to comply with the court's more detailed instructions in its April 1, 2014 order until the evening before the hearing on the plaintiffs' motion for contempt. Finally, the record reveals that once appellant fully complied with the instructions set forth in the trial court's order, the Facebook page was reactivated. As there is evidence to support the trial court's findings of contempt, these findings will not be disturbed. See Pate v. Pate, 280 Ga. 796, 798 (631 SE2d 103) (2006) ("If there is any evidence in the record to support the trial judge's determination that a party has wilfully disobeyed a trial court's order, the decision of the trial court will be affirmed on appeal. [Cit.]."); City of Cumming v. Realty Development Corp., 268 Ga. 461, 462 (491 SE2d 60) (1997) .

3. Appellant asserts the trial court erred in adopting the construction of the operating agreement set forth in the Third Report of the Special Master, arguing the special master improperly considered provisions of the tax code and IRS regulations in construing the agreement's terms. Appellant further contends

that the construction adopted by the trial court works a forfeiture of financial interests to which the Davis Estate was entitled, asserting that the estate should have continued to receive distributions equal to those made to Roth through and until December 18, 2013, the date on which the sale of Davis' membership units to Roth was completed. These claims lack merit.

Section 7.01 (a) of VCP South's operating agreement specifically states:

> The Members acknowledge that the Company will be treated as a "partnership" for federal and Georgia state tax purposes. All provisions of this Agreement and the Company's articles of organization are to be construed so as to preserve that tax status.

As it is clear that the operating agreement, itself, not only authorizes, but requires consideration of applicable tax codes and regulations in construing its terms, appellant's first claim of error fails.

Appellant's second argument, which primarily challenges the trial court's establishment of September 30, 2011 as a reasonable cutoff date for determining the financial rights of the Davis Estate, is equally unpersuasive.[10] While the operating agreement devised by the parties in this case set no specific time

---

[10] We note that the establishment of a cut-off date was part of the special master's first report to which neither party objected and which, thereafter, was adopted by the trial court in accordance with Rule 46 (G) (2) of the Uniform Rules of the Superior Court.

within which the purchase of a deceased member's membership units by the surviving member was to be effectuated, it did set forth a simple and expeditious procedure for accomplishing the sale. Georgia law requires that the performance of contractual obligations by a contracting party "be substantially in compliance with the spirit and the letter of the contract and completed within a reasonable time." OCGA § 13-4-20. By establishing a cutoff date of September 30, 2011, some 20 months after Davis' death, as the date beyond which the Davis Estate could no longer continue to receive an equal share of the profits and losses of the LLC, as well as any distributions, the trial court correctly refused to allow appellant to thwart the intent of the parties by unreasonably impeding the sale. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. [Cit]." Brack v. Brownlee, 246 Ga. 818, 820 (273 SE2d 390) (1980). Given the delays caused by appellant's challenges to the operating agreement's provisions, as well as the additional delay caused by appellant's transfer of the membership units from the Davis Estate to herself and her sons pursuant to her right to a years' support, we find no error in the trial court's determination that the Davis Estate was only entitled to distributions from the LLCs accruing through and

18

including September 30, 2011, but not thereafter.[11] Although appellant now asserts that the special master's findings with respect to this holding were unclear and in conflict with other findings made in his report, we disagree. Nor do we find that by adopting the special master's cutoff date, the trial court's order improperly works a forfeiture of financial rights to which the Davis Estate was entitled.

4. Given our determination that the trial court did not err in establishing September 30, 2011 as the date upon which the Davis' Estate's financial rights in VCP South terminated, see Div. 3, supra, we find that portion of the trial court's order limiting future discovery in this case to events occurring before the cutoff date based on relevancy to be appropriate and not an abuse of discretion. See Bowden v. Medical Center, Inc., ___ Ga. ___ (___ SE2d ___) (2015 WL3658819) (discussing the issue of "relevancy" as it pertains to the scope of discovery under OCGA § 9-11-26 (b) (1)).

---

[11] We also find no merit to appellant's contention that Roth's exercise of the option was nonconforming, and thus merely a counteroffer, simply because the trial court determined some of the plaintiffs' proposed closing documents were unnecessary. See Redmond v. Sinclair Refining Co., 204 Ga. 699, 705 (3) (51 SE2d 409) (1949). Nor do we agree that Roth's death subsequent to the cutoff date established by the trial court, but prior to the actual closing, somehow voided Roth's valid exercise of the option. See Martin v. Schindley, 264 Ga. 142, 143 (442 SE2d 239) (1994) ("An option becomes a contract between the parties binding from the date of its execution when the option is exercised according to its terms.").

In this cross-appeal, the plaintiffs/cross-appellants first assert the trial court erred in allowing the Davis Estate to receive distributions of profits through September 30, 2011, arguing that such distributions should have stopped as of January 31, 2010, the end of the month in which Davis died.  This argument, however, directly conflicts with the unambiguous terms of the operating agreement which specifically provide that a ceased member's financial rights continue so long as the cessation did not result in dissolution of the company, and it lacks merit.

Cross-appellants alternatively contend the Davis Estate's financial rights should have ended when Roth exercised his option to purchase Davis' membership units on or around November 11, 2010, arguing that once the option was exercised, the sale was essentially a *fait accompli* at a price set by the company's accountant.  At the time Roth exercised his option, however, no valuation of Davis' membership units by Staley had been completed.  Although acknowledging that the Davis Estate's efforts to have Staley replaced hampered his valuation, the special master also observed that the company had complete control over how quickly the valuation was completed.  We find no error in the

trial court's determination that a reasonable cutoff date for the Davis Estate's financial rights was the last day of the month in which Staley's valuation in compliance with the terms of the operating agreement was completed and presented to the Davis Estate. See Div. 3, supra.

Finally, cross-appellants claim the trial court erred in allowing the Davis Estate to maintain an ownership interest in VCP South through September 30, 2011 in light of Georgia's law governing professional corporations. See OCGA § 14-7-5 (a) ("Shares in a professional corporation may only be issued to, held by, or transferred to a person who is licensed to practice the profession for which the corporation is organized. . . except as otherwise permitted under this Code section."). This issue was not raised or ruled on below, however, and it presents nothing for our review. See Messaadi v. Messaadi, 282 Ga. 126, 129 (3) (646 SE2d 230) (2007) ("This Court is empaneled to review rulings by lower courts and will not address issues not ruled upon below.").

For the foregoing reasons, the issues raised in the cross-appeal lack merit.

Judgment in Case Nos. S15A0142 and S15X0143 are affirmed. All the Justices concur.

21