**FIFTH DIVISION**
**REESE, P. J.,**
**MARKLE and COLVIN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT.  ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**June 17, 2020**

# In the Court of Appeals of Georgia

A20A0622, A20A0623.  POLLARD  v.  QUEENSBOROUGH NATIONAL BANK & TRUST COMPANY; and vice versa.

REESE, Presiding Judge.

Queensborough National Bank and Trust Company ("Queensborough") foreclosed on real property owned by Robert Pollard, Jr., that was pledged as security as part of a guaranty agreement. Pollard filed the underlying lawsuit challenging, among other things, Queensborough's right to foreclose and his continuing status as a guarantor. The parties filed cross-motions for summary judgment, and both parties now appeal from the trial court's summary judgment order. For the reasons set forth infra, we reverse and remand in Case No. A20A0622, and affirm in Case No. A20A0623. We hold, among other things, that Pollard was discharged as a guarantor

pursuant to OCGA § 10-7-20 when Queensborough compromised with and released Pollard's co-guarantors.

The background facts are largely not in dispute. In 2011, Tomberlin Automative Group, Inc., ("TAG") executed two promissory notes in favor of Queensborough in the aggregate amount of approximately $6.7 million. As part of that transaction, several entities and people related to TAG (the "TAG Guarantors") executed guaranties and pledged various parcels of real estate as security for the loan. In 2012, Queensborough, TAG, and the TAG Guarantors agreed to modify the loan agreements. As part of the modification, Pollard became a guarantor and pledged real estate owned by Pollard (the "Pollard Property") as further security for TAG's obligations under the notes.

TAG defaulted under its obligations for the loan, and filed for bankruptcy relief. Queensborough initiated a suit against the TAG Guarantors for a money judgment on the guaranty instruments that they had executed. Pollard was not a party to the action. In March 2014, Queensborough and the TAG Guarantors entered into a consent order, which provided for a payment plan and a judgment against the TAG Guarantors in the approximate amount of $5.2 million. Pollard was not a party to the

2

consent order. The TAG Guarantors made some payments but ultimately defaulted under the terms of the consent order.

From 2014 to 2018, Queensborough collected various amounts of money realized from collateral securing the notes and applied the proceeds to the loans. One of the TAG Guarantors, FBX3, LLC, filed for bankruptcy relief. As part of those bankruptcy proceedings, FBX3 and Queensborough entered into a consent order. The consent order provided, among other things, that Queensborough would release Michael Tomberlin, another one of the TAG Guarantors, from any personal liability associated with the $5.2 million judgment in exchange for a certificate of deposit that was pledged as security for the loan.

After exhausting the other collateral from the TAG Guarantors, there was still a substantial amount owed to Queensborough under the notes. Queensborough notified Pollard of its intent to enforce its rights against Pollard and initiate foreclosure proceedings against the Pollard Property. In June 2018, Pollard initiated the instant lawsuit in Richmond County seeking various equitable remedies, including claims for a declaratory judgment that Queensborough was not legally entitled to foreclose on the property and that Pollard had been released as a guarantor, and seeking an accounting of the loan.

In August 2018, Queensborough conducted a non-judicial foreclosure sale of the Pollard Property. Queensborough purchased the property for $1,250,000. After the foreclosure, Pollard amended his complaint to include a claim for wrongful foreclosure.

Queensborough filed a motion for summary judgment, and Pollard filed a motion for partial summary judgment. The trial court denied Pollard's motion, and granted in part and denied in part Queensborough's motion. These appeals followed.

"We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant."[1] With these guiding principles in mind, we now turn to the parties' specific claims of error.

*Case No. A20A0622*

1. Pollard argues that he was released as a guarantor when Queensborough released and compromised with his co-guarantors. Queensborough responds that Pollard was not released as a guarantor, and that he consented, though the guaranty agreements, to any release or modification with his co-guarantors.

---

[1] *9766, LLC v. Dwarf House, Inc.*, 331 Ga. App. 287, 288 (771 SE2d 1) (2015) (citation and punctuation omitted).

"The contract of suretyship or guaranty is one whereby a person obligates himself to pay the debt of another in consideration of a benefit flowing to the surety or in consideration of credit or indulgence or other benefit given to his principal[.]"[2] In Georgia, there is "no distinction between contracts of suretyship and guaranty."[3]

"The creditor may release or compound with the surety without releasing the principal, but the release of or compounding with one surety shall discharge a cosurety."[4] "To 'compound' is to compromise, to effect a composition, to obtain discharge from a debt by the payment of a smaller sum."[5] "This rule is based on the rationale that such a release causes injury or impairment to the obligation of the . . . co-guarantor."[6] This rationale — that an increase of risk or injury discharges the guarantor — underpins several of the surrounding code sections as well.[7]

---

[2] OCGA § 10-7-1.

[3] Id.

[4] OCGA § 10-7-20.

[5] *Marret v. Scott*, 212 Ga. App. 427, 428 (1) (a) (441 SE2d 902) (1994) (citation and punctuation omitted).

[6] Id. at 429 (1) (b) (citation and punctuation omitted).

[7] See, e.g., OCGA § 10-7-21 (a change in the loan agreement, without consent of the guarantor, discharges the guarantor); OCGA § 10-7-22 (an act by the lender which increases the guarantor's risk or exposes the guarantor to greater liability

5

We have recognized two exceptions to OCGA § 10-7-20. The first is that a guarantor may consent to the lender's release or compromise with a co-guarantor.[8] This consent may be given in advance in the guaranty agreement.[9] The second exception is when the co-guarantors are not jointly liable for the same portion of the debt.[10] That is, "each guarantor is a limited surety, liable only for a proportionate share of the underlying debt."[11]

Few of our cases apply this second exception. The trial court and the parties all cite to our decision in *Marret v. Scott*.[12] In *Marret*, a lender filed suit against ten guarantors to enforce its promissory notes.[13] The trial court ultimately issued a

discharges the guarantor). Under OCGA § 10-7-27, OCGA §§ 10-7-20 through 10-7-26 are superceded to the extent they conflict with the negotiable instruments section of the Uniform Commercial Code, OCGA § 11-3-101 et seq. Neither party contends that the negotiable instruments section of the Uniform Commercial Code applies in this case.

[8] See *Baby Days v. Bank of Adairsville*, 218 Ga. App. 752, 755-756 (3) (463 SE2d 171) (1995).

[9] See id.

[10] See *Marret*, 212 Ga. App. at 429 (1) (a).

[11] Id. (emphasis omitted).

[12] 212 Ga. App. 427.

[13] Id.

judgment in favor of the lender, and established proportional liabilities as to all the guarantors.[14] The lender settled with four of the guarantors, and the remaining six non-settling guarantors argued that the settlement was a composition that discharged them as guarantors under OCGA § 10-7-20.[15] We rejected that argument. We held that "each guarantor [was] a limited surety, liable only for a proportionate share of the underlying debt," rather than "joint sureties to the same obligation."[16] The guarantors in that case were "concatenated limited sureties" such that "the sum of their total individual liabilities equal[ed] the principal amounts of the notes, but no one surety [was] jointly liable with another for the same portion of the debt."[17] Thus, we concluded that the six non-settling guarantors were not discharged of their obligations under OCGA § 10-7-20.[18]

(a) Applying *Marret* to the facts of this case, the trial court found that Pollard was a limited surety and his obligations were not discharged by OCGA § 10-7-20.

---

[14] Id. at 428.

[15] Id. at 428 (1) (a).

[16] Id. at 429 (1) (a) (citation and punctuation omitted).

[17] Id. (punctuation omitted).

[18] See id.

7

The court reasoned that Pollard was only liable for a portion of the underlying debt because his liability was limited to the value of the Pollard Property, as opposed to the TAG Guarantors who were individually liable for all of the debt.

We disagree. Pollard and the TAG Guarantors were "joint sureties to the same obligation" and "jointly liable with another for the same portion of the debt."[19] While Pollard's exposure may have been limited to the value of the Pollard Property, it did not represent a "proportionate share of the underlying debt."[20] Rather, like the TAG Guarantors, the property secured all debt between TAG and Queensborough. Queensborough altered the amount of debt the Pollard Property had to satisfy and the risk of foreclosure by releasing and compounding with the TAG Guarantors.[21] By contrast, in *Marret*, the settlement with the four co-guarantors did not alter the risk

---

[19] *Marret*, 212 Ga. App. at 429 (1) (a) (citation, punctuation, and emphasis omitted).

[20] Id.; cf. *Holcombe v. Eng*, 163 Ga. App. 343, 343-345 (294 SE2d 568) (1982) (co-guarantors' liability limited to five percent of the outstanding loan balance).

[21] See *Marret*, 212 Ga. App. at 429 (1) (b) (OCGA § 10-7-20 "is based on the rationale that such a release causes injury or impairment to the obligation of the . . . co-guarantor.") (citation and punctuation omitted).

to the other six co-guarantors, because each co-guarantor was liable for a specific, proportionate amount of the underlying debt.[22]

(b) Queensborough argues Pollard consented to any release or modification with Pollard's co-guarantors, and points to the following provisions:

> [Pollard] hereby expressly authorize[s] [TAG] to pledge or hypothecate all or any part of said property for the indebtedness aforesaid, and all renewals and extensions thereof, and also for all other indebtedness of the same borrower to you, created at any time before this authorization shall have been revoked in writing and all renewals and extension thereof, and I waive notice of all or any such indebtedness or extension or renewal thereof.

The security deeds for the loans defined "indebtedness" as:

> [A]ll principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of, and substitutions for the Note or Related Documents.

By contrast, the guaranty agreement with the TAG Guarantors contained the following provision:

---

[22] See id.

If the obligations of one or more GUARANTORS hereunder are terminated or if one or more GUARANTORS are released from this Continuing Guaranty, for any reason whatsoever, whether by an act of LENDER or otherwise, such termination or release shall not operate to terminate this Continuing Guaranty with respect to any other GUARANTOR or operate to release any other Guarantor from the obligations hereunder.

As noted above, a guarantor may consent to the lender's release or compromise with a co-guarantor.[23] In this case, however, the provisions in Pollard's guaranty agreements did not amount to such consent. At best, those provisions allowed Queensborough to modify the loan agreement with TAG without discharging Pollard as a guarantor.[24] But there was no provision in Pollard's guaranty agreements

---

[23] See *Baby Days*, 218 Ga. App. at 755-756 (3).

[24] See OCGA § 10-7-21 ("Any change in the nature or terms of a contract is called a 'novation'; such novation, without the consent of the surety, discharges him.").

10

allowing Queensborough to compromise with other guarantors.[25] Thus, Pollard did not consent to any release or modification with his co-guarantors.

Accordingly, Pollard was discharged as a guarantor pursuant to OCGA § 10-7-20 when Queensborough released and compromised with Pollard's co-guarantors. We thus reverse the denial of Pollard's motion for partial summary judgment and the grant in part of Queensborough's motion for summary judgment, and remand for further proceedings not inconsistent with this opinion.

2. Pollard argues that the trial court erred in finding that the debt had an outstanding balance of approximately $1.4 million. Given our holding in Division 1, we need not address this argument.

*Case No. A20A0623*

3. Queensborough argues that the trial court erred in denying in part its motion for summary judgment because Pollard's action was barred under principles of res judicata and collateral estoppel.

---

[25] Cf. *Baby Days*, 218 Ga. App. at 755 (3) (guaranty provided that "[a]uthority and consent are hereby expressly given said creditor from time to time, and without notice of the undersigned, to give and make such settlements and compromises as it may deem proper with respect to any of the indebtedness, liabilities and obligations covered by this guaranty, including the taking or releasing of security and surrendering of documents") (punctuation and emphasis omitted).

11

Pollard filed the instant lawsuit in Richmond County. During the pendency of this lawsuit, Pollard filed a petition for a temporary restraining order ("TRO") in Jefferson County. Pollard requested that the Superior Court of Jefferson County enjoin the foreclosure sale while the Richmond County court adjudicated the matter. The Superior Court of Jefferson County denied Pollard's request for a TRO and dismissed the petition. The Richmond County court rejected Queensborough's argument that Pollard's action was barred by the doctrines of res judicata and collateral estoppel, reasoning that not all of the issues raised in Pollard's instant complaint were addressed by the Superior Court of Jefferson County.

> The doctrine of res judicata prevents the re-litigation of all claims which have already been adjudicated, or which could have been adjudicated, between identical parties or their privies in identical causes of action. Res judicata prevents a plaintiff from instituting a second complaint against a defendant on a claim that has already been brought, after having previously been adjudged not to be entitled to the recovery sought on that claim. Three prerequisites must be satisfied before res judicata applies — (1) identity of the cause of action, (2) identity of the parties or their privies, and (3) previous adjudication on the merits by a court of competent jurisdiction.[26]

---

[26] *Karan v. Auto-Owners Ins.*, 280 Ga. 545, 546 (629 SE2d 260) (2006) (citation omitted); see also OCGA § 9-12-40 ("A judgment of a court of competent jurisdiction shall be conclusive between the same parties and their privies as to all

The related doctrine of collateral estoppel

> precludes the re-adjudication of an issue that has previously been litigated and adjudicated on the merits in another action between the same parties or their privies. Like res judicata, collateral estoppel requires the identity of the parties or their privies in both actions. However, unlike res judicata, collateral estoppel does not require identity of the claim — so long as the issue was determined in the previous action and there is identity of the parties, that issue may not be re-litigated, even as part of a different claim. Furthermore, collateral estoppel only precludes those issues that actually were litigated and decided in the previous action, or that necessarily had to be decided in order for the previous judgment to have been rendered. Therefore, collateral estoppel does not necessarily bar an action merely because the judgment in the prior action was on the merits. Before collateral estoppel will bar consideration of an issue, that issue must actually have been decided.[27]

A party may request a TRO only if it can show "immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his

---

matters put in issue or which under the rules of law might have been put in issue in the cause wherein the judgment was rendered until the judgment is reversed or set aside.").

[27] *Karan*, 280 Ga. at 546 (citation and punctuation omitted).

attorney can be heard in opposition."[28] TROs cannot exceed 30 days, and after the grant of a TRO without notice, the trial court should conduct a hearing on whether to grant a temporary injunction.[29]

> In deciding whether to issue an interlocutory injunction, the trial court should consider whether: (1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of her claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest.[30]

"[T]he decision to grant an interlocutory injunction must often be made under time constraints that do not allow for the careful deliberation and reflection that accompany a full trial on the merits."[31]

---

[28] OCGA § 9-11-65 (b) (1).

[29] See OCGA § 9-11-65 (b) (2).

[30] *SRB Investment Svcs. v. Branch Banking & Trust Co.*, 289 Ga. 1, 5 (3) (709 SE2d 267) (2011) (citation and punctuation omitted).

[31] *City of Waycross v. Pierce County Bd. of Commrs.*, 300 Ga. 109, 111 (1) (793 SE2d 389) (2016) (citations and punctuation omitted).

14

In this case, Queensborough has not established that Pollard's claims were barred by res judicata or collateral estoppel. Pollard's claims were not necessarily decided by the Superior Court of Jefferson County in denying the TRO.[32] The factors in granting a TRO or interlocutory injunction do not require an adjudication of the underlying merits.[33] Accordingly, the trial court did not err in denying summary judgment to Queensborough with respect to this argument.

4. Queensborough argues that the trial court erred in finding that issues of material fact remained as to Pollard's claim that Queensborough breached its duty of good faith and fair dealing with respect to its refusal of Pollard's tender offer.

"Every contract implies a covenant of good faith and fair dealing in the contract's performance and enforcement."[34] In this case, Pollard alleged that Queensborough violated this duty by, among other things, foreclosing on the property

---

[32] See *Karan*, 280 Ga. at 547 (In order to apply collateral estoppel, the "issue necessarily had to be decided in order for the previous judgment to have been rendered.") (punctuation and emphasis omitted).

[33] See id. at 547-548 (trial court order in refusing to open default did not serve as collateral estoppel or res judicata for related claim because that order did not necessarily rule on the merits).

[34] *Secured Realty Investments. v. Bank of North Ga.*, 314 Ga. App. 628, 630 (1) (b) (725 SE2d 336) (2012).

even though he was discharged as a guarantor. Given our holding in Division 1, and Queensborough's rejection of Pollard's settlement offer of $330,000, the trial court did not err in finding that issues of material fact existed regarding this claim. Accordingly, we affirm the trial court's judgment denying in part Queensborough's motion for summary judgment.

*Judgment affirmed in Case No. A20A0623. Judgment reversed and case remanded with direction in Case No. A20A0622. Markle and Colvin, JJ., concur.*

16