**FOURTH DIVISION**
**DILLARD, P. J.,**
**BROWN and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely**
**filed.**
　　　**https://www.gaappeals.us/rules**

**January 31, 2025**

# In the Court of Appeals of Georgia

A24A1229. LIGHTFOOT. v. WELLSTAR HEALTH SYSTEM
　　　INC. et al.

DILLARD, Presiding Judge.

Dr. Harry Lightfoot appeals the trial court's denial of his "emergency motion for an interlocutory injunction" in a lawsuit against his former employer, Wellstar Health System, Inc. ("Wellstar"), in which he asserted, *inter alia*, claims for defamation and tortious interference with business relationships.[1] Specifically, Lightfoot requested that Wellstar be ordered to "void" a report it submitted to the National Practitioner Data Bank ("NPDB") that contained disparaging public information regarding his professional conduct. Now, Lightfoot argues the trial court

---

[1] Lightfoot does not specify what kind of tortious interference he is asserting, but it appears that, in substance, his claim is one for interference with business relationships.

abused its discretion in denying his motion because (1) the NPDB regulations and guidebook require Wellstar to void the report; (2) he has no adequate remedy at law; and (3) the evidence weighs in favor of granting the injunction. For the following reasons, we affirm.

At the outset, it is helpful to summarize the administrative process regarding the mandatory federal reporting of adverse-employment actions taken against medical professionals. The NPDB is a web-based repository of reports "containing information on medical malpractice payments and certain adverse actions related to healthcare practitioners . . . ."[2] It was created by Title IV of the Health Care Quality Improvement Act of 1989 ("HCQIA")[3] as "a tool that prevents [such] practitioners from moving state to state without disclosure or discovery of previous damaging performance."[4] Importantly, under 42 U.S.C § 11133 (a) (1), hospitals and other healthcare entities are required to file reports with the NPDB when it

(A) takes a professional review action that adversely affects the clinical

---

[2] United States Department of Health and Human Services ("DHS"), The National Practitioner Data Bank, *About Us*, https://www.npdb.hrsa.gov/topNavigation/aboutUs.jsp (last visited Jan. 15, 2025).

[3] *See* 42 U.S.C. § 11101 *et seq.*

[4] DHS, NPDB, *About Us*, https://www.npdb.hrsa.gov/topNavigation/aboutUs.jsp (last visited Jan. 15, 2025).

privileges of a physician for a period longer than 30 days;

(B) accepts the surrender of clinical privileges of a physician

(i) while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct, or

(ii) in return for not conducting such an investigation or proceeding; or

(C) in the case of such an entity which is a professional society, takes a professional review action which adversely affects the membership of a physician in the society . . . .[5]

The HCQIA provides for broad immunity for healthcare providers from claims for damages arising from their compliance with NPDB reporting requirements. Specifically, 42 U.S.C. § 11111 (a) (1) provides as follows:

If a professional review action (as defined in section 11151 (9) of this title) of a professional review body meets all the standards specified in section 11112 (a) of this title, except as provided in subsection (b)—

(A) the professional review body,

(B) any person acting as a member or staff to the body,

_____

[5] 42 U.S.C. § 11133 (1) (a) (A)-(C).

(C) any person under a contract or other formal agreement with

the body, and

(D) any person who participates with or assists the body with
respect to the action,

*shall not be liable in damages* under any law of the United States or of any State (or political subdivision thereof) with respect to the action. The preceding sentence shall not apply to damages under any law of the United States or any State relating to the civil rights of any person or persons, including the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq. and the Civil Rights Acts, 42 U.S.C. 1981, et seq.[6]

Nevertheless, a health care entity that "fails substantially to meet the requirement[s] of subsection (a) (1) [of 42 U.S.C. § 11133] shall lose the protections of section 11111 (a) (1) of this title if the Secretary publishes the name of the entity under section 11111 (b) of this title."[7]

To assist reporting entities in complying with NPDB requirements, DHS published the NPDB Guidebook,[8] which requires healthcare entities to file certain

---

[6] (Emphasis supplied).

[7] 42 U.S.C. § 11133 (c) (1).

[8] The Guidebook is not included in the record, but it may be downloaded in pdf format at DHS, NPDB, *Guidebook* (2018), *available at* https://www.npdb.hrsa.gov/resources/aboutGuidebooks.jsp (last visited Dec. 12,

reports when adverse-employment actions are taken against a physician and defines the four types of reports that can be filed.[9] The first is an "initial report," which may be followed by three other supplemental reports. The initial report notifies the NPDB of, *inter alia*, a medical-malpractice payment or an adverse action against a physician, and the physician at issue is notified that it has been filed.[10]

Next, a hospital may submit a "correction report," which "corrects an error or omission in a previously submitted report by replacing it."[11] A hospital may also submit a "void report," which withdraws a prior report in its entirety and removes it from the "disclosable record."[12] The three reasons for voiding a report are (1) the report was submitted in error; (2) the action was not reportable because it did not meet the NPDB reporting requirements; and (3) the action was overturned on appeal.[13]

---

2024) ("Guidebook."). Our citations in this opinion are to the pdf version of the Guidebook, as it is far easier to locate specific sections with pages numbers within that version.

[9] *See* Guidebook, *supra* note 8, at §§ E-7-E-10, pp. 87-90.

[10] *See id.* at § E-7, p.87.

[11] *Id.*

[12] *Id.* at § E-8, p. 88.

[13] *See id.*

Finally, medical-care providers must submit a "revision-to-action" report when there is an adverse-employment action that "modifies an adverse action previously reported to the NPDB."[14] A revision-to-action report is "appropriate only if it *modifies* the previously submitted report."[15] And unlike a correction report, a revision-to-action report does *not* replace a previously reported adverse action, but is instead treated as a "separate action that pertains to the previous action."[16] Indeed, both the initial and revision-to-action reports become part of the "disclosable record."[17] So, if a hospital submits a report noting that a physician's clinical privileges were suspended for 60 days, but the suspension was later reduced to 45 days, the hospital must submit a revision-to-action report reflecting the reduction, and it is considered an addendum to the initial report.[18] According to the NPDB, combining the two reports "provide[s]

---

[14] *Id.*

[15] *Id.* at § E-10, p. 90 (emphasis supplied). As an example, the Guidebook provides that a correction report would be required if the initial report contained an error in the physician's address. *See id.* at § E-8, p. 88. So, unlike a revision-to-action report, a correction report seems to concern non-substantive, minor corrections to an initial report, rather than a modification in the adverse action(s) taken. In any event, Lightfoot does not allege that a correction report was appropriate in this case.

[16] *See* Guidebook, *supra* note 8, *at* §§ E-8; E-9, pp.88-89 (emphasis supplied).

[17] *Id.* at § E-9, p. 89.

[18] *See id.*

a more complete explanation of the events."[19]

Turning to the instant case, Cobb Hospital provides four levels of review when investigating possible deficiencies in a physician's patient care with the final decision regarding any adverse action being made by the Wellstar Board of Directors (the "Board"). First, an investigative committee—a subcommittee of the Medical Executive Committee (the "MEC")— initiated an investigation into Lightfoot after becoming aware of several negative outcomes involving his patients. Five of those cases were the subject of an external review, and the reviewer had "serious concerns" with two of them. Lightfoot agreed to voluntarily refrain from exercising his hospital privileges during the investigation. Then, following its investigation and several meetings with Lightfoot, the investigative committee submitted a report to the MEC, detailing its concerns and ultimately recommending that Lightfoot be subject to a Performance Improvement Plan ("PIP"). The PIP required Lightfoot to (1) take a documentation course; (2) obtain pre-operative approval for all soft tissue and perianal cases; (3) be subject to retrospective review of all of his cases for six months; and (4) discuss complex cases with his partners.

Upon receiving the investigating committee's report and recommendations, the

---

[19] *Id.*

MEC continued to investigate the case. The MEC ultimately informed Lightfoot, via letter, that Wellstar was imposing a "permanent precautionary suspension" of his clinical privileges to perform four specified surgeries and procedures, implementing a new PIP, and releasing him from his voluntary agreement to refrain from exercising his remaining clinical privileges. Particularly relevant here, the MEC indicated in its initial report to the NPDB that the suspension was based on its finding that "continuation of certain surgical [and] procedural privileges may result in *imminent danger to the health and/or safety of the [h]ospital's patients*."[20]

In September 2022, Wellstar sent Lightfoot a lengthy letter detailing the administrative proceedings conducted so far. The letter also notified Lightfoot that, during its investigation, the MEC considered his meetings with the investigative committee and the MEC; the medical-malpractice claims filed against him; his entry into a recent medical-malpractice settlement; cases that triggered peer review since 2017; and the quality of care he provided while a 2017 action plan was in effect and thereafter.

Lightfoot was also notified that his remaining hospital clinical privileges would be subject to his execution of, and his continued compliance with, the new PIP for one

---

[20] (Emphasis supplied).

year. Specifically, the PIP implemented by the MEC included the following:

1. Lightfoot must complete the Physicians Assessment and Educational Intervention program;

2. He cannot serve on the emergency-call rotation;

3. He must discuss complex cases and review of operative plans with his partners;

4. The MEC would conduct a "focused review" of all of Lightfoot's cases for one year; and

5. He must meet with certain hospital staff members to discuss his progress with the PIP.

The MEC further advised Lightfoot that (1) his precautionary suspension was reportable to the NPDB as an "adverse action," and (2) he had the right to request a hearing under Wellstar's bylaws. Indeed, Wellstar was *required* to report the suspension because it would last more than 30 days.[21] Ultimately, on March 23, 2022, the MEC submitted an initial report regarding Lightfoot to the NPDB, which included

---

[21] *See* 42 U.S.C. § 11133 (a) (1) (A) (providing that, as to physicians, "[e]ach health care entity which . . . takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days . . . *shall* report to the Board of Medical Examiners, in accordance with section 11134(a) of this title . . . ." (emphasis supplied)).

its determination that the suspension was necessary because he posed an imminent danger to the health of Wellstar's patients.

Following the MEC's submission of the initial report to the NPDB, Lightfoot requested a hearing on the matter, which was held before the "appellate review panel."[22] After reviewing the underlying record and considering the parties' oral arguments, the appellate review panel submitted a summary of its conclusions and recommendations to the Board, which issued the final decision in this case. Specifically, the appellate review panel recommended that (1) Lightfoot be required to complete three specified educational courses, and (2) upon completion of these courses, the hospital could void the initial report filed with the NPDB on March 23, 2022.

Thereafter, the Board reviewed the history of Lightfoot's case, considered the recommendations made at each level of review, and issued the final decision. At some point between the appellate review panel's decision and the Board's final decision,

_____

[22] While the NPDB's Guidebook and Wellstar's bylaws suggest that, at this point, Lightfoot was entitled to a full evidentiary hearing, the record does not contain a transcript of such a hearing. So, to the extent any evidence was submitted at a hearing, we cannot consider it. *See Taylor v. Bentley*, 166 Ga. App. 887, 887 (2) (305 SE2d 617) (1983) ("[E]videntiary matters and cannot be considered in the absence of a transcript of the evidence presented at trial."). Nevertheless, the record contains enough evidence for us to resolve this appeal.

Lightfoot left his employment Wellstar.[23] Specifically, the Board ruled as follows:

1. Lightfoot failed to meet the standard of care expected of Wellstar physicians in three of the five cases that were reviewed, but those failures *did not reflect a threat of immediate harm to patients* such that a precautionary suspension was warranted;

2. If Lightfoot was still a Wellstar employee, the Board would have adopted the recommendations of the investigating committee that Lightfoot

> (a) attend a documentation course; (b) obtain pre-operative approval of soft tissue and perianal cases; (c) be subject to retrospective review of all of his cases for six months; and (d) discuss complex cases with his partners;

3. Because Lightfoot was no longer a member of Wellstar's medical staff, the hospital could not implement the requirements that he take educational courses or obtain pre-approval for certain procedures;

4. The requirement that Lightfoot obtain pre-operative approval for certain procedures is a corrective action reportable to the NPDB;

5. The initial report filed on March 23, 2022, must be revised to reflect that the precautionary suspension was not affirmed by the Board. The

---

[23] Although it is unclear exactly when Lightfoot either left or was dismissed from his job at Wellstar, the Board's opinion makes clear that he was no longer a Wellstar employee when it issued its decision. But the revision-to-action report, discussed *infra*, suggests that his hospital privileges were terminated on February 1, 2022.

report also must be revised to reflect that the pre-operative approval requirement was a corrective action, which Wellstar would have been required to report if Lightfoot remained on Wellstar's staff;

6. The protection of the hospital's patients is paramount, and the Board encouraged Lightfoot to complete the educational courses which, while not a reportable corrective action to the NPDB, would benefit him and his patients; and

7. While the hospital was required to *revise the initial NPDB report to remove a finding that Lightfoot posed a threat of imminent harm to patients* and reflect that the imposition of pre-operative approval of certain procedures, Wellstar may, if lawful, vacate or void the revised report if Lightfoot completed the three recommended educational courses.[24]

In compliance with the Board's instructions, Wellstar submitted a one-page revision-to-action report to the NPDB regarding Lightfoot's case. The report expressly notes that the initial precautionary suspension of some of Lightfoot's hospital privileges was *not affirmed by the Board* because, while he failed to satisfy the requisite standard of care on three of his reviewed cases, those failures *did not reflect an immediate harm to patients.* The report further noted that if Lightfoot had remained on staff, he would have been required to obtain pre-operative approval for certain

---

[24] (Emphasis supplied).

surgeries and procedures. Furthermore, the report noted that if Lightfoot satisfied the recommended educational courses, the foregoing restriction could be removed. And as explained *supra*, revision-to-action reports are treated as a supplement to—rather than a replacement of—the initial report and both reports remain available to the public.

Thereafter, Lightfoot sued Wellstar, asserting several claims—including actions for defamation and tortious interference with business relations—and contending that the initial NPDB report must be voided because it inaccurately labels him as an "imminent or immediate threat" to his patients and contains false statements related to the suspension of his hospital privileges.[25] While the litigation was pending, Lightfoot filed "an emergency motion for an interlocutory injunction," seeking an order requiring Wellstar to void or vacate the initial report. Specifically, Lightfoot took issue with the language in the initial NPDB report, which indicated that he posed a threat of imminent harm to patients, when the Board's final decision found otherwise. Following Lightfoot and Wellstar's responsive pleadings and oral argument, the trial court denied Lightfoot's motion. This appeal follows.

---

[25] Lightfoot also sued Wellstar for "breach of a legal duty"; racial discrimination; negligent hiring, training, retention, and supervision; punitive damages; and attorney fees. While these claims remain pending below, they do not appear to be relevant to the interlocutory-injunction motion at issue on appeal.

It is well established that the reason for granting interlocutory injunctions is to "preserve the status quo, as well as to balance the conveniences of the parties, pending a final adjudication of the case."[26] Furthermore, the decision of whether to "grant equitable relief—such as an interlocutory injunction—is generally a matter within the sound discretion of the trial court, and the trial court's decision should be sustained on appeal when there has been no abuse of that discretion."[27] Indeed, we will not reverse the trial court's decision to grant or deny an interlocutory injunction "unless the trial court made an error of law that contributed to the decision, there was no evidence on an element essential to relief, or the court manifestly abused its discretion."[28] Importantly, an interlocutory injunction is "an extraordinary remedy,

---

[26] *Daneshgari v. Patriot Towing Servs., LLC*, 361 Ga. App. 541, 543 (864 SE2d 710) (2021) (punctuation omitted); *accord Kinard v. Ryman Farm Homeowners' Ass'n, Inc.*, 278 Ga. 149, 149 (598 SE2d 479) (2004).

[27] *Daneshgari*, 361 Ga. App. at 543(punctuation omitted); *see SRB Inv. Servs., LLLP v. Branch Banking & Tr. Co.*, 289 Ga. 1, 5 (3) (709 SE2d 267) (2011) ("We will not reverse the trial court's decision to grant or deny an interlocutory injunction unless the trial court made an error of law that contributed to the decision, there was no evidence on an element essential to relief, or the court manifestly abused its discretion." (punctuation omitted)); *Kinard*, 278 Ga. at 149 ("The trial court has broad discretion under OCGA § 9-5-8 in deciding whether to grant a request for an interlocutory injunction.").

[28] *SRB Inv. Servs.*, Ga. at 5 (3); *accord Lane Dermatology v. Smith*, 360 Ga. App. 370, 373-74 (1) (861 SE2d 196) (2021).

and the power to grant it must be prudently and cautiously exercised."[29] To that end, our Supreme Court has explained that

> an interlocutory injunction should not be granted unless the moving party shows that: (1) there is a substantial threat that the moving party will suffer irreparable injury if the injunction is not granted; (2) the threatened injury to the moving party outweighs the threatened harm that the injunction may do to the party being enjoined; (3) there is a substantial likelihood that the moving party will prevail on the merits of [his] claims at trial; and (4) granting the interlocutory injunction will not disserve the public interest.[30]

Moreover, the first factor—substantial threat of irreparable injury if an interlocutory injunction is not entered—is "the most important one, given that the main purpose of an interlocutory injunction is to preserve the status quo temporarily to allow the parties and the court time to try the case in an orderly manner."[31] Lastly, because the test for the issuance of an interlocutory injunction is "a balancing test, it

---

[29] *City of Waycross v. Pierce Cnty. Bd. of Commissioners*, 300 Ga. 109, 110 (1) (793 SE2d 389) (2016) (punctuation omitted); *see SRB Inv. Servs.*, Ga. at 5 (3) ("Although an interlocutory injunction is an extraordinary remedy, and the power to grant it must be prudently and cautiously exercised, the trial court is vested with broad discretion in making that decision." (punctuation omitted)).

[30] *City of Waycross*, 300 Ga. at 111 (1) (punctuation omitted); *accord SRB Inv. Servs.*, 289 Ga. at 5 (3).

[31] *City of Waycross*, 300 Ga. at 110 (1) (punctuation omitted); *accord Wood v. Wade*, 363 Ga. App. 139, 141 (869 SE2d 111) (2022).

is not incumbent upon the movant to prove all four factors to obtain the interlocutory injunction."[32] With these guiding principles in mind, we turn to Lightfoot's specific claims of error.

1. Lightfoot first argues the trial court erred in denying his motion for an interlocutory injunction because the NPDB's regulations and guidelines require Wellstar's report as to his alleged misconduct be voided. We disagree.

As an initial matter, and as Lightfoot acknowledges, the trial court expressly noted that it took no position on whether he was likely to prevail on the *merits* of his case (*i.e.*, whether the NPDB and Wellstar's bylaws required Wellstar to void its initial report on Lightfoot). Indeed, in denying Lightfoot's motion for an interlocutory injunction, the trial court stated, "[t]he [c]ourt makes no final finding of fact or conclusion of law as to the merits of Dr. Lightfoot's request for a permanent injunction regarding the NPBD reports." And suffice it to say, we are a "court of review, not of first view."[33] As a result, issues which have not been ruled upon by the

---

[32] *City of Waycross*, 300 Ga. at 111 (1); *accord Wood*, 363 Ga. App. at 141.

[33] *The State v. Jennings*, 362 Ga. App. 790, 796 (1) (c) (869 SE2d 183) (2022) (punctuation omitted).

trial court "may not be raised on appeal."[34]

Even so, while this claim of error may relate to whether there is a substantial likelihood that Lightfoot would ultimately prevail on the merits of his claims, it is unrelated to three of the four factors that a trial court must consider in granting or denying a motion for an interlocutory injunction.[35] Furthermore, rather than ruling on the likelihood that Lightfoot would prevail on the *merits* of this case, the trial court found Lightfoot did not show that he was substantially likely to prevail at trial because (1) state law may be preempted by federal law;[36] (2) Lightfoot has not exhausted his

---

[34] *Ga. Dep't of Nat. Res. v. Coweta Cnty.*, 261 Ga. 484, 485 (405 SE2d 470) (1991).

[35] *See supra* note 30 & accompanying text.

[36] *See, e.g.*, *Ex parte Ala. State Bd. of Pharmacy*, 253 So3d 972, 981 (Ala. Civ. App. 2017) (holding that the lower court's order for hospital to file a void report with the NPDB, retracting an earlier report as to a physician, would violate the hospital's mandatory obligations under federal law, and thus, the lower court's order was preempted by federal law); *Diaz v. Provena Hosps.*, 817 NE2d 206, 213 (II) (C)(Ill. App. 2004) ("T]he trial court's orders requiring the Hospital to submit a void report would impede the accomplishment of Congress's objectives in enacting the HCQIA . . . By requiring the Hospital to retract a report that it was required to make under the HCQIA, the trial court directly thwarts Congress's objectives in enacting the HCQIA. Thus, the orders at issue are preempted by federal law."); *but see Doe v. Cmty. Med. Ctr., Inc.*, 221 P3d 651, 659 (Mont. 2009) (adopting a "presumption against preemption," declining to follow *Diaz*, and finding the trial court was not presented with evidence of an express declaration in the HCQIA of its intent to preempt state law).

administrative remedies;[37] and (3) Georgia's peer-review statute might render

Wellstar immune from injunctive relief in the absence of a showing of malice.[38] Thus,

because the foregoing are not completely unfounded concerns,[39] we are not persuaded

---

[37] The trial court found Lightfoot possibly failed to exhaust his administrative remedies because he had not participated in the NPDB's dispute-resolution process. In this regard, our Supreme Court "has consistently held that as long as there is an effective and available administrative remedy, a party is required to pursue that remedy before seeking equitable relief in superior court." *Ga. Dep't of Cmty. Health v. Ga. Soc. of Ambulatory Surgery Centers*, 290 Ga. 628, 629 (724 SE2d 386) (2012) (punctuation omitted). But as noted by Lightfoot, our Supreme Court has also "recognized a 'futility' exception to the exhaustion requirement, defined narrowly as a situation where further administrative review would result in another decision on the same issue by the same body." *Ga. Dep't of Behav. Health & Developmental Disabilities v. United Cerebral Palsy of Ga.*, 298 Ga. 779, 788 (2) (a) (784 SE2d 781) (2016). On appeal, Lightfoot argues the futility exception applies because another decision would be made on the same issue by the same body (*i.e.*, Wellstar). But participating in a dispute resolution program *facilitated* by the NPDB, rather than governed by Wellstar, would not necessarily result in the same decision if negotiations were successful. Regardless, as explained *infra*, this issue is not determinative as to the outcome of this appeal.

[38] *See DeKalb Med. Ctr., Inc. v. Obekpa*, 315 Ga. App. 739, 744 (2) (728 SE2d 265) (2012) ("Having found the hospital immune from suit and entitled to judgment in its favor, there exists no basis upon which to sustain the [trial] court's order imposing an interlocutory injunction prohibiting the hospital from reporting its adverse decision concerning [the plaintiff to the NPDB] . . . ."); *Taylor v. Kennestone Hosp., Inc.*, 266 Ga. App. 14, 22 (4) (b) (596 SE2d 179) (2004) (holding that a physician's defamation claim against a hospital based on an NPDB report was meritless because he failed to present evidence from which a jury could reasonably infer that the reports to the data bank were both false and malicious).

[39] *See supra* notes 36-38.

the trial court abused its discretion in determining there is not a *substantial* likelihood Lightfoot would prevail in this case.

Additionally, the NPDB Guidebook provides only three bases for voiding a prior report. Specifically, a report may be voided if (1) it was submitted in error; (2) the action was not reportable because it did not meet the NPDB reporting requirements; or (3) the action was overturned on appeal.[40] Here, Lightfoot has not suggested the initial report was submitted in error or that it did not meet the NPDB reporting requirements. And while the Board ordered Wellstar to modify the adverse actions taken against Lightfoot, it did not overturn the entire report because it determined there were still reportable actions (*e.g.*, the requirement that Lightfoot obtain pre-operative approval for certain procedures). In sum, a revision-to-action report is only permissible if it *modifies* an adverse action against a physician previously reported to the NPDB, and that is exactly what happened here. And as previously noted, according the NPDB, combining the initial and revision-to-action reports provides a more complete explanation of the events.[41] Under these circumstances, we will not substitute our judgment for the trial court's broad discretion in determining

---

[40] *See supra* note 13 & accompanying text.

[41] *See supra* note 19 & accompanying text.

that Lightfoot has not shown a *substantial* likelihood he will ultimately prevail in this case.[42]

2. Next, Lightfoot contends the trial court erred in finding that he was not entitled to injunctive relief because he has an adequate remedy at law. Specifically, he argues the trial court erroneously found that those remedies included complying with the Board's educational requirements for voiding the report and participating in the NPDB's dispute resolution process. This claim likewise lacks merit.

Although Lightfoot characterizes the trial court's ruling as finding generally that he had an adequate remedy at law, the court made the findings noted *supra* in determining he had "not sufficiently shown a threat of irreparable injury[,]" which is the most important of the four factors it was tasked with considering.[43] And the court essentially found that participating in the NPDB dispute-resolution process or completing certain educational courses identified by Wellstar were alternatives to the extraordinary injunctive relief he sought.

Even so, Lightfoot argues that requiring him to take the educational courses the Board required so as to void the initial report would unlawfully force him into a

---

[42] *See supra* note 27, 29-30 & accompanying text.

[43] *See supra* note 30 & accompanying text.

settlement agreement. He further claims that participating in the NPDB's dispute-resolution process would be futile because the NPDB could not compel Wellstar to change its decision, and so it would ultimately result in the same issue being decided by the same entity (*i.e.*, Wellstar's Board).[44] But even if the foregoing were true, we conclude the trial court did not abuse its significant discretion in holding that Lightfoot failed to show he would suffer a threat of irreparable injury if injunctive relief were not granted for other reasons.[45]

So, while Wellstar's initial report noted that Lightfoot posed a threat of immediate harm to patients such that a precautionary suspension was warranted, the initial report and revision-to-action totaled only *three* pages, one of which expressly clarified that Wellstar ultimately rejected that finding. As a result, during the pendency of this action, the public or potential employers will have easy access to

---

[44] *See supra* note 37 & accompanying text.

[45] While the trial court limited its findings on whether Lightfoot established that he would suffer a threat of an irreparable injury if the injunction were not granted to his opportunity to participate in dispute resolution or attend certain educational course, this Court can affirm a trial court decision if it is right for any reason. *See Hartman v. PIP-Grp., LLC*, 349 Ga. App. 233, 236 (4) (825 SE2d 601) (2019)("[W]e will affirm a trial court's decision if it is right for any reason."). And under the particular circumstances of this case, Lightfoot has not established that he would suffer a threat of irreparable injury if the injunctive relief is not granted for other reasons.

Wellstar's determination that it ultimately did *not* find Lightfoot to constitute a threat of immediate harm to Wellstar's patients.

Simply put, the first factor of the balancing test—showing a substantial threat of irreparable injury if an interlocutory injunction is not entered—is "the most important one, given that the *main purpose* of an interlocutory injunction is to *preserve the status quo temporarily* to allow the parties and the court time to try the case in an orderly manner."[46] And here, preserving the status quo would allow both the initial report and revision-to-action report—which makes the Board's ultimate findings clear—to remain publicly available through the NPDB during the pendency of this litigation. Under these circumstances, the trial court did not abuse its considerable discretion in finding that this important factor weighed against granting an interlocutory injunction.

3. Finally, Lightfoot argues the evidence weighs in favor of granting the requested injunction. Yet again, we disagree.

As to this claim of error, Lightfoot addresses most of the four factors (noted *supra*)[47] that a trial court must consider in deciding whether to grant an interlocutory

---

[46] *City of Waycross*, 300 Ga. at 110 (1) (emphasis supplied); *accord Wood*, 363 Ga. App. at 141 (2) (c).

[47] *See supra* note 30 & accompanying text.

injunction. First, Lightfoot notes the trial court expressly took no position on the likelihood that he would prevail on his claim for permanent injunctive relief. As a result, he contends this factor does not weigh for or against granting interlocutory injunctive relief. And while it is true the trial court did not determine whether Lightfoot's claim for injunctive relief was meritorious in *substance*, the court did find that he failed to establish that there was a *substantial* likelihood he would ultimately prevail on his claims because, meritorious or not, they are likely to be barred for various other reasons. Indeed, the trial court expressed concern that federal law might preempt state law on the matter, Lightfoot had not exhausted his administrative remedies, and Georgia's peer-review statute might render Wellstar immune from injunctive relief in the absence of a showing of malice. Needless to say, the trial court's concerns in this regard were not unfounded.[48]

Lightfoot also complains the trial court took "no position" on whether Wellstar would be harmed if injunctive relief were granted; and at most, it found Wellstar would be a "victim of uncertainty." Indeed, the trial court concluded that Wellstar "may or may not" be harmed if it granted Lightfoot's motion for an injunction; but it also noted that Wellstar could be sanctioned for failing to file accurate and

---

[48] *See supra* notes 36-38 & accompanying text.

appropriate reports with the NPDB.[49] Nevertheless, the trial court did not find this factor weighed in favor of granting the injunction. In any event, the trial court did not abuse its discretion in concluding that the other three injunctive-relief factors weighed in favor of denying the injunction, including the most important one—whether the movant would suffer irreparable injury if relief is not granted. And as previously noted, the trial court was tasked with applying a balancing test when considering all four factors.

Lightfoot also maintains the trial court abused its discretion in finding that granting the injunction would be contrary to the public interest. But in doing so, the trial court aptly noted that, as a matter of public policy, the HCQIA expressly provides "[t]here is a national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance."[50] Indeed, Congress explicitly found that "[t]here is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review."[51] And while the court made

---

[49] *See* 42 U.S.C. § 11111 (b) (detailing the repercussions for a health-care entity that fails to comply with NPDB reporting requirements).

[50] 42 U.S.C. § 11101 (2).

[51] *Id.* at § 11101 (5).

no findings regarding Lightfoot's competency as a physician, it concluded that it would disserve the public interest by issuing an injunction restricting a hospital from making what it considers to be an accurate, lawful, and *mandatory* report to the NPDB. In this regard, the trial court noted that the investigative committee, the MEC, the hearing committee, the appellate review panel, *and* the Wellstar Board *all* concluded there were at least some adverse actions against Lightfoot reportable to the NPDB and contained in the initial report. And based on the foregoing, the trial court reasonably concluded that compelling Wellstar to void the initial report would frustrate Congress's *codified* intent, as well as the *codified* public policy of the NPDB.

Even so, Lightfoot maintains the trial court erred in finding the public interest weighed against granting the injunction because Wellstar admits the initial report is inaccurate and that it is "no answer" to the accuracy of the report that there was some reportable discipline. But again, the NPDB provides only three reasons to void a prior report, none of which are that the report needs to be substantively *modified*.[52] To the contrary, the NPDB provides that a revision-to-action report, which Wellstar filed, is required for substantive modifications to a prior report so the public has a more

---

[52] *See supra* note 13 & accompanying text.

complete understanding of the proceedings.[53] That is exactly what happened in this case.

In sum, considering (1) our deferential standard of review when a trial court grants or denies a motion for interlocutory-injunction relief;[54] (2) that such relief is an extraordinary remedy;[55] (3) whether to grant an interlocutory injunction requires the

---

[53] *See supra* notes 14, 19 & accompanying text. Lightfoot contends the trial court improperly relied upon "extrinsic evidence or personal experience about Wellstar to conclude that Dr. Lightfoot must have competency issues because Wellstar does not terminate doctors without [a] good reasons." But while the court made statements to this effect when it questioned attorneys during *oral argument*, the trial court did not mention any personal opinions or extrinsic evidence in its detailed final order. To the contrary, in its final order, the trial court took no position on Lightfoot's competency as a physician. And, of course, the trial court's written order "controls over any oral statements made at [a] hearing . . . ." *In the Interest of Muse*, 372 Ga. App. 579, 582 (3) (905 SE2d 682) (2024) (punctuation omitted).

[54] *See SRB Inv. Servs.*, 289 Ga. at 5 (3) ("We will not reverse the trial court's decision to grant or deny an interlocutory injunction unless the trial court made an error of law that contributed to the decision, there was no evidence on an element essential to relief, or the court *manifestly abused its discretion*." (punctuation omitted) (emphasis supplied)); *Daneshgari*, 361 Ga. App. at 543 ("[T]he decision of whether to grant equitable relief—such as an interlocutory injunction—is generally a matter within the *sound discretion* of the trial court, and the trial court's decision should be sustained on appeal when there has been no abuse of that discretion." (punctuation omitted) (emphasis supplied)).

[55] *See City of Waycross*, 300 Ga. at 110 (1) ("[A]n interlocutory injunction is an extraordinary remedy, and the power to grant it must be prudently and cautiously exercised." (punctuation omitted)); *SRB Inv. Servs.*, 289 Ga. at 5 (3) ("Although an interlocutory injunction is an extraordinary remedy, and the power to grant it must be 'prudently and cautiously' exercised, the trial court is vested with broad discretion in

trial court to exercise its discretion in applying a balancing test,[56] and (4) the underlying purpose of an interlocutory injunction is to preserve the status quo,[57] the trial court did not abuse its substantial discretion in applying the four-factor balancing test in the manner it did.

For all these reasons, we affirm the trial court's denial of Lightfoot's motion for an interlocutory injunction.

*Judgment affirmed. Brown and Padgett, JJ., concur.*

---

making that decision.").

[56] *See City of Waycross*, 300 Ga. at 112 (1) ("Because the test for the issuance of an interlocutory injunction is a balancing test, it is not incumbent upon the movant to prove all four factors to obtain the interlocutory injunction." (punctuation omitted); *Denhardt v. Jones*, 363 Ga. App. 865, 867 (2) (873 SE2d 234) (2022) (same).

[57] *See* notes 50-51 & accompanying text.